# IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

VIRTUS CAPITAL L.P., individually and on behalf of all others similarly situated,

      Plaintiff,

      v.

EASTMAN CHEMICAL COMPANY, JOHN L. TEEGER, JOHN V. GENOVA, RICHARD K. CRUMP, JOHN W. GILDEA, PHILIP M. SIVIN, KARL W. SCHWARZFELD, DANIEL M. FISHBANE, WALTER TREYBIG, MARTIN D. SASS, M.D. SASS INVESTORS SERVICES, INC., RESURGENCE ASSET MANAGEMENT, L.L.C., RE/ENTERPRISE ASSET MANAGEMENT L.L.C., RESURGENCE ASSET MANAGEMENT INTERNATIONAL, L.L.C., CORPORATE RESURGENCE PARTNERS, L.L.C., CORPORATE RESURGENCE PARTNERS II, L.L.C., M.D. SASS CORPORATE RESURGENCE PARTNERS III, L.P., RESURGENCE ASSET MANAGEMENT, L.L.C. EMPLOYEE RETIREMENT PLAN, TRUST "O" FOR A PORTION OF THE ASSETS OF THE KODAK RETIREMENT INCOME PLAN, KODAK PENSION PLAN, M.D. SASS ASSOCIATES, INC. EMPLOYEE PROFIT SHARING PLAN, M.D. SASS RE/ENTERPRISE PORTFOLIO COMPANY, L.P., M.D. SASS RE/ENTERPRISE II, L.P., RESURGENCE PARALLEL FUND, L.L.C., RESURGENCE PARALLEL FUND II, L.L.C., RESURGENCE PARALLEL FUND III, L.L.C., EASTMAN TC, INC., AND MOELIS & COMPANY LLC,

      Defendants.

C.A. No. 9808-VCL

**MEMORANDUM OPINION**

Date Submitted: December 9, 2014
Date Decided: February 11, 2015

Joel Friedlander, Jeffrey M. Gorris, Benjamin P. Chapple, FRIEDLANDER & GORRIS, P.A., Wilmington, Delaware; *Attorneys for Plaintiff*.

T. Brad Davey, J. Matthew Belger, POTTER ANDERSON & CORROON LLP, Wilmington, Delaware; Barry S. Pollack, POLLACK SOLOMON DUFFY LLP, Boston, Massachusetts; *Attorneys for Defendants Martin D. Sass, M.D. Sass Associates, Inc. Employee Profit Sharing Plan, M.D. Sass Investor Services, Inc., Resurgence Asset Management, L.L.C., and RE/Enterprise Asset Management L.L.C.*

A. Thompson Bayliss, Adam K. Schulman, ABRAMS & BAYLISS LLP, Wilmington, Delaware; *Attorneys for Defendant John V. Genova.*

Thomas W. Briggs, Jr., Kevin M. Coen, Frank R. Martin, Brendan W. Sullivan, MORRIS, NICHOLS, ARSHT & TUNNELL LLP, Wilmington, Delaware; *Attorneys for Defendants Eastman Chemical Company, and Eastman TC, Inc.*

Lewis H. Lazarus, Brett M. McCartney, Patricia A. Winston, MORRIS JAMES LLP, Wilmington, Delaware; *Attorneys for Defendants John L. Teeger, Richard K. Crump, and John W. Gildea.*

Rolin P. Bissell, Paul J. Loughman, YOUNG CONAWAY STARGATT & TAYLOR, LLP, Wilmington, Delaware; Paul D. Flack, Reagan D. Pratt, PRATT & FLACK LLP, Houston, Texas; *Attorneys for Defendant Walter B. Treybig*.

Gregory P. Williams, Susan M. Hannigan, J. Scott Pritchard, RICHARDS LAYTON & FINGER, P.A. Wilmington, Delaware; Yosef J. Reimer, Matthew Solum, KIRKLAND & ELLIS LLP, New York, New York; *Attorneys for Defendants Philip M. Sivin, Karl W. Schwarzfeld, and Daniel M. Fishbane*.

David E. Ross, S. Michael Sirkin, SEITZ ROSS ARONSTAM & MORITZ LLP, Wilmington, Delaware; William Savitt, Benjamin D. Klein, WACHTELL, LIPTON, ROSEN & KATZ, New York, New York; *Attorneys for Defendant Moelis & Company LLC*.

**LASTER, Vice Chancellor.**

Defendant Martin D. Sass controlled Sterling Chemicals, Inc. ("Sterling" or the "Company"), a publicly traded Delaware corporation. The complaint contains detailed allegations sufficient to state a claim that Sass breached his duty of loyalty by causing Sterling to be sold at a fire-sale price to alleviate a liquidity crisis that Sass was facing at his investment funds. The complaint also contains detailed allegations sufficient to state a claim that Eastman Chemical Company ("Eastman"), the acquirer, aided and abetted Sass' breaches of fiduciary duty by exploiting the conflicts of interest that Sass faced. None of the defendants have moved to dismiss the complaint for failing to state a claim on which relief could be granted.

Instead, Sass has moved to dismiss the complaint pursuant to Rule 12(b)(2), arguing that this court lacks personal jurisdiction over him. So has one of the entities through which he controlled Sterling: the M.D. Sass Associates, Inc. Employee Profit Sharing Plan (the "Sass Plan"). Because the defendants engaged in acts within the State of Delaware and purposefully availed themselves of the benefits of Delaware law, this court has jurisdiction over Sass and the Sass Plan.

## I.  FACTUAL BACKGROUND

The facts are drawn principally from the Verified Class Action Complaint (the "Complaint") and the documents it incorporates by reference. At this procedural stage, the Complaint's allegations are assumed to be true, and the plaintiff receives the benefit of all reasonable inferences. For purposes of evaluating whether a defendant is subject to the court's jurisdiction, "the court may go beyond the pleadings and look to affidavits and

other discovery of record." *Chandler v. Ciccoricco*, 2003 WL 21040185, at *8 (Del. Ch. May 5, 2003) (Strine, V.C.). The factual recitation therefore also incorporates matters drawn from the parties' submissions in connection with the motions to dismiss.

## A.      Resurgence and Sterling

Sass controlled a financial complex comprising various investment funds and related entities that operated under the "Resurgence" trade name. The investment funds included defendants Resurgence Parallel Fund, L.L.C.; Resurgence Parallel Fund II, L.L.C.; Resurgence Parallel Fund III, L.L.C.; Corporate Resurgence Partners, L.L.C.; Corporate Resurgence Partners II, L.L.C.; M.D. Sass Corporate Resurgence Partners III, L.P.; M.D. Sass RE/Enterprise Portfolio Company, L.P.; and M.D. Sass RE/Enterprise II, L.P. Other funds that Sass controlled included the Sass Plan; the Resurgence Asset Management, L.L.C. Employee Retirement Plan; the Kodak Pension Plan; and Trust "O" For a Portion of the Assets Of The Kodak Retirement Income Plan. This decision refers to these funds collectively as the "Resurgence Funds." The Resurgence financial complex also included fund-management entities such as defendants Resurgence Asset Management, L.L.C.; Resurgence Asset Management International, L.L.C.; and RE/Enterprise Asset Management, L.L.C. This decision refers to the asset management entities as the "RAM Entities." The pinnacle entity through which Sass controlled the Resurgence financial complex was defendant M.D. Sass Investors Services ("Sass Services"), which controlled the RAM Entities. This decision refers to the Resurgence Funds, the RAM Entities, and Sass Services collectively as "Resurgence."

2

In 2002, Resurgence made a substantial investment in Sterling. Headquartered in Houston, Sterling owned a 290-acre petrochemical manufacturing facility in Texas City on Galveston Bay. The facility had two primary manufacturing plants: an acetic acid plant and a temporarily idled plasticizer plant. The facility also had other underutilized assets, including storage tanks, deep injection wells for hazardous waste disposal, two deep water docks, three barge docks, and direct access to two railways. Additionally, Sterling owned 160 acres of excess land, NOx credits worth millions of dollars, and more than $90 million in federal net operating losses that could be used as a tax shield.

Through its 2002 investment, Resurgence acquired beneficial ownership of approximately 56% of Sterling's common stock and 100% of Sterling's preferred stock. Sass allocated these holdings across the Resurgence Funds, the RAM Entities, and Sass Services. Through their aggregate ownership stake, the entities controlled over 88% of Sterling's voting power. Through Resurgence, Sass controlled Sterling.

**B.      The Fund Expirations**

In 2008, the largest Resurgence Fund, defendant M.D. Sass Corporate Resurgence Partners, L.P. ("Fund I") reached the end of its ten-year term. Fund I owned over 25% of Sterling's equity. Resurgence negotiated with Fund I's biggest investor to extend Fund I's term for another year. In return, Sass agreed to fund personally a cash escrow that would cover his portion of the returns owed to Fund I's investors. After obtaining the biggest investor's support, Resurgence sought and obtained consents to the extension from other Fund I investors.

3

When soliciting and obtaining the consents, Resurgence represented that the additional time was critical to maximizing the value of Sterling, which was Fund I's most significant remaining investment:

> Sterling will have approximately $150 million in cash, leaving it with no net debt, a strong acetic acid business and an attractive footprint at its Texas City site for future development. We believe that there is significant value to the underutilized assets (including the real estate, deepwater port, rail and access to the electrical grid and gas pipelines, chemical permits next to large refineries and valuable NOX credits)
>
> . . .
>
> In summary, we believe the best way to maximize this value, which we believe could be materially more than recent valuation levels, is to continue to work on attracting a significant development opportunity to replace businesses that we have closed at Sterling's valuable deep water dock and adjoining gulf coast facility.

Compl. ¶ 24.

At its annual investor conference on September 10, 2008, Resurgence again represented to its investors that Sterling had significant upside. Resurgence stated that Sterling could be worth between $437.7 million and $1.037 billion with a projected 10-20% ownership of a potential $2-4 billion project at the Texas City site. Resurgence also stated that Sterling was negotiating with potential partners to develop the 160 acres of excess land for a production process project.

In February 2009, Resurgence sought consents from Fund I's investors to extend its life for another year, until March 16, 2010. Once again Resurgence emphasized Sterling's potential to deliver value. Resurgence told investors that the "development potential of Sterling's assets remains substantial" and "selling the Partnership's interests

4

[in Sterling] in the current extremely depressed financial and economic environment would result in a very unattractive price." Compl. ¶ 26. Resurgence received the necessary consents, but Fund I's partnership agreement forbade any further extensions.

With the second extension, the expiration of Fund I in March 2010 corresponded with the expiration of two other Resurgence Funds: M.D. Sass Corporate Resurgence Partners II, L.P. ("Fund II") and M.D. Sass Corporate International (the "International Fund"). Fund II held approximately 9.4% of Sterling's equity; the International Fund held approximately 5% of Sterling's equity. In total, Resurgence funds holding approximately 40% of Sterling's equity would dissolve in March 2010 and be forced to wind up.

## C.  Mid-2009: Resurgence Decides To Sell Sterling.

Until mid-2009, Resurgence focused on operating Sterling and developing the Texas City site. Within Resurgence, the champion of this strategy was Byron Haney, the portfolio manager with primary responsibility for the Sterling investment. Haney believed sufficiently in Sterling's value that he turned down premium offers for Sterling. In 2007, Gulf Hydrogen and Energy, LLC ("Gulf Hydrogen") offered approximately $392 million to acquire Sterling. In February 2008, D.E. Shaw proposed a range of $300 to $350 million on behalf of an investor group that included Gulf Hydrogen. The principal behind Gulf Hydrogen, Ken Berry, believed that Sterling rejected both offers because Haney thought Resurgence could execute the acquirer's plans for Sterling and capture the bulk of the resulting $1 billion in value for Resurgence.

Then, in mid-2009, the hedge funds managed by Resurgence suffered significant losses. Redemption requests poured in. Haney, who was the chief investment officer for the hedge funds, abruptly left Resurgence.

Faced with a need for liquidity, Resurgence changed its plans. Despite having told its investors in February 2009 that selling Sterling "in the current extremely depressed financial and economic environment would result in a very unattractive price," Resurgence decided to sell. Sterling's CEO, defendant John V. Genova, understood that the redemption demands and concomitant need for liquidity drove the decision.

Defendant Moelis & Company, LLC ("Moelis") pitched Sterling for the sell-side work. Moelis understood the liquidity concerns driving the sale and was skeptical about the timing for purposes of maximizing value. The Moelis pitchbook noted that "resolution" of Resurgence's liquidity issues was "the primary factor driving the timing of a potential transaction involving Sterling" and that "the current economic, financial and chemical industry environment [was] not ideal for realizing the highest value." Compl. ¶ 29. Moelis managing director David Faris expressed surprise that Resurgence would explore a sale in 2009. He advised that it "was not the ideal time [to sell] given what was going on in the overall economy and what was going on in the chemical industry specifically." *Id.*

Sterling did not retain Moelis in 2009. Instead, Sterling hired Jefferies LLC ("Jefferies"). Jefferies contacted sixty-four potential buyers and made it clear that Resurgence was looked for prices north of $250 million. Jefferies could not generate any interest at that price.

6

Despite Jefferies' failure to find a buyer for the Company at a price above $250 million, Resurgence still needed to sell. In pursuit of that goal, Sass recommended that Sterling add defendant John L. Teeger to its board of directors (the "Board"). Teeger was a close personal friend of Sass who played golf and tennis with him regularly. Teeger joined the Board, increasing its size from six to seven. The other six directors, all of whom are defendants, were:

- Philip M. Sivin, an employee of Resurgence and Sass' son-in-law;

- Karl W. Schwarzfeld, an employee of Resurgence;

- Daniel M. Fishbane, an employee of Resurgence;

- Genova, Sterling's CEO;

- Richard K. Crump, who appears at this stage to be an independent, outside director; and

- John W. Gildea, who appears at this stage to be an independent, outside director.

From the outset, Sass envisioned that Teeger would work to monetize Resurgence's investment in Sterling. On July 10, 2010, Sass emailed Teeger, Siven, Schwarzfeld, and Sterling's CFO about the need to sell the Company. He wrote: "John Teeger & I discussed the need for a strong focus on finding an acquirer to monetize RAM's investment. John made the suggestion, which I support, of forming a Special Committee for that purpose comprised of the 3 of you & John Genova and our new CFO . . . ." Compl. ¶ 33. Teeger responded privately to Sass: "Wow—you sure don't mess around!" *Id.*

7

Prompted by Sass' email, Sterling formed an informal M&A committee. On July 28, 2010, Schwarzfeld emailed Sass with an update after the committee's first meeting:

> Phil [Sivin] and/or I are going to have a call with Genova tomorrow (without his team who was on the phone today) to reiterate our priority (cash today being priority #1, building in a meaningful way towards cash tomorrow being priority #2) and refocus his demeanor in interacting with this or future potential buyers (ie. "I know you are at $100 to $150m, but come out for a plant tour and we will show you why were are worth substantially more" as opposed to "You can come for a plant tour, but it is a waste of time if the number is $100m").

*Id.* ¶ 35. Sass responded: "I'm glad you will continue to focus on priority #1." *Id.*

On August 19, 2010, Schwarzfeld emailed Sass and Sivin, copying Teeger, with an update on a subsequent committee meeting. Although the email discussed potential alternatives Genova had identified to unlock the value of Sterling's underutilized assets, none contemplated a sale of Sterling. Sass responded that Genova "still isn't focused on our top priority – selling Sterling Chemicals. Please send us a summary of his financial incentives on a sale – did we not [provide] sufficient motivation for him?" *Id.* Teeger reassured Sass that a sale was his first priority: "The first choice is selling the company and getting an exit—tough to do." *Id.* Sass then reiterated his bottom line: "Our largest Resurgence PE fund has reached the end of its term and needs to monetize Sterling asap." Compl. ¶ 36.

On September 7, 2010, Genova emailed Sivin and Schwarzfeld a letter of intent from a potential acquirer, which Sivin forwarded to Sass. Sass asked him to "share [it] confidentially w/ John Teeger and provide his feedback prior to our meeting today[.]" Dkt. 66, Ex. 9. Sivin indicated that he and Schwarzfeld "would like to discuss [the letter

8

of intent] with [Sass] before sharing it with John." *Id.* When Sass asked why, Sivin replied, "better to explain in our in person meeting but relates to different constituencies/duties." *Id.* Sass then made Teeger's role clear:

> John [Teeger] is on our side and knows RAM's #1 priority is to sell the company. he [sic] can help us in that process. i [sic] believe that blocking him out or delaying information flow to him is wasting his expertise = he know [sic] that I asked [him] to join the Board to help us make the best deal we can for our Funds.

*Id.*

### D.    Eastman Expresses Interest.

In August 2010, Eastman approached Sterling about a supply agreement for plasticizer, referred to in the industry as a tolling agreement. Eastman is a global specialty chemical company and the world's largest manufacturer of non-phthalate plasticizer.

Eastman wanted access to Sterling's plasticizer manufacturing capacity to capitalize on a shift in plasticizer demand. Due to regulatory issues and health concerns, demand for phthalate plasticizers was declining. Eastman had developed a non-phthalate plasticizer known as "Eastman 168," and Eastman saw an opportunity to capture market share if it could bring a significant volume to market quickly. But Eastman had limited production capacity, especially in North America, and Eastman needed additional capacity to achieve its goals.

Eastman regarded Sterling's plasticizer manufacturing capacity at the Texas City plant as a key asset. Eastman wanted either to get a tolling agreement in place or acquire Sterling. In August 2010, the head of Eastman's plasticizer business explained Eastman's position in an internal email to members of Eastman's M&A team:

> [W]e will need an additional North American plasticizer asset in order to make an orderly transition over the next few years – in particular to deal with the [Eastman 168] transition . . . . Our preferred position is Sterling and [we have] been in discussions with Sterling to get a CDA in place to allow tolling discussions to occur, but we believe we need to go ahead and simultaneously begin an effort to acquire Sterling . . . . [A] number of market issues are putting some urgency on our finding a 3rd plant option in the near term if possible.

Compl. ¶ 39. A twenty-two page internal Eastman presentation from the same month identified a tolling agreement or an acquisition as the options giving Eastman the highest returns. The presentation singled out Sterling as a candidate.

On September 13, 2010, Gary McDermott, the head of Eastman's M&A team, spoke with Schwarzfeld, one of the Resurgence employees on the Board, about whether Resurgence would consider selling Sterling. Schwarzfeld reported on the conversation in an email to Sass and Sivin.

> Eastman is working with Sterling on a commercial opportunity around the plasticizers business (upon the BASF termination). Gary [McDermott] was interested in exploring if there was potentially more to do with Sterling then [sic] just the commercial opportunity, but before doing his "homework" wanted to get a sense of MDSass's receptiveness to such a situation. I told Gary … "it is a public company and we have a majority of the board of directors …, but it is public information that we funded this company … in 2002. Obviously now that it is almost 2011, speaking generally, that is a long time for a private equity owner to hold an investment."

*Id.* ¶ 41. At the pleading stage, the plaintiff is entitled to the reasonable inference that when Schwarzfeld contrasted the investment funding year of 2002 with the then-current year of 2011 and observed that "speaking generally, that is a long time for a private equity owner to hold an investment," he was signaling specifically that Resurgence was receptive to selling Sterling.

10

On October 26, 2010, Eastman expressed interest in purchasing Sterling for $95-$105 million. Genova described the offer to Schwarzfeld, who reported on the conversation in an email to Sass, Sivin, and Teeger.

> Genova believes Eastman is looking to expand its plasticizers business. We have been in talks with them about Sterling tolling Plasticezers [sic] for Eastman. There was a bit of a break through [sic] on that process last week, and it turns out all are now very comfortable that the engineering for what Eastman wants can be done, Sterling thinks they can get Eastman to sign a long term agreement that gets Sterling $5m to $6m a year (covering fixed costs that would otherwise get allocated to Acetic, with slight profit). *Genova suspects Eastman is looking at Sterling as opportunity to get that Plasticezers [sic] deal cheap, plus ability to expand Plasticezers [sic], plus location to serve as terminal for rest of Eastman North America business.*

> We need to discuss who and how we should respond.

*Id.* ¶ 47 (emphasis added). Despite Genova's belief that Eastman was looking to buy Sterling "cheap" as a way to obtain plasticizer capacity, Sass was more than intrigued. He responded: "We should definitely pursue discussion for sale to Eastman. I suggest John [Teeger] work closely with one or more of you to move this along." *Id.* Sivin agreed and added, "[W]e should try to get them up as much as possible and close it!" *Id.*

On October 29, 2010, Sass, Schwarzfeld, Sivin, and Teeger discussed potential negotiating strategies. Sivin believed that because Eastman "originally reached out to RAM [] it should be us that negotiates it." Dkt. 66, Ex. 10. Teeger observed that "we will definitely need a fairness opinion for protection, particularly as the Sterling common will get very little compared with a public trading price of $7." *Id.* Later that day, Sass asked Genova to "provide a call-in # & Draft Agenda to help us all coordinate, communicate & cooperate in getting a deal done." *Id.* Ex. 11.

11

### E. The Special Committee

On November 1, 2010, Eastman submitted a formal non-binding expression of interest in acquiring Sterling. On November 5, the Board formed a special committee to represent the interests of Sterling's minority stockholders (the "Special Committee"). The Special Committee initially consisted of Teeger and Gildea. The minutes do not reflect any discussion of Teeger's relationship with Sass.

On November 15, 2010, the Special Committee held its first meeting. The Special Committee members retained counsel and discussed Teeger's relationship with Sass. On November 17, the Special Committee met again and engaged in further discussion about Teeger's relationship with Sass. They decided to recommend that the Board add a third member to the Special Committee. On January 4, 2011, Crump joined the Special Committee.

Meanwhile, Sass made sure that Resurgence would maintain its control over Sterling until a sale could be completed. As noted, Fund I, Fund II, and the International Fund dissolved when their terms expired in March 2010. In the resulting winding up process, Sass could have caused the funds to distribute their Sterling shares in kind to their investors. Had Resurgence done so, then Sass no longer would have controlled a majority of Sterling's outstanding voting power.

Sass chose not to cause the funds to make an in-kind distribution. Instead, in November 2010, the funds transferred their Sterling equity into newly formed Delaware entities that would serve as liquidating vehicles. Sass continued to control the liquidating vehicles, allowing him to maintain control over a supermajority of Sterling's voting

12

power. The liquidating vehicles did not pay any management fees or incentive fees that might have offset Sass' desire to sell Sterling quickly.

## F.     A Compromised Negotiation Process

The Complaint alleges that the Special Committee's negotiation process was compromised at many levels. First, despite his close relationship with Sass, Teeger took on an outsized role in the Special Committee's process. He served as Chair of the Special Committee, acted as the lead negotiator with Eastman, and was the principal interface with Resurgence. Although Crump and Gildea nominally served as members of the Special Committee, they deferred to Teeger on all significant decisions and actions. The Complaint provides detailed examples to support this characterization.

Second, the Complaint alleges that the Special Committee retained a financial advisor whom Eastman promptly compromised with overtures about future work. On January 7, 2011, Teeger asked Faris of Moelis to advise the Special Committee. Monit Bhalla, a member of Eastman's M&A team and Eastman's lead negotiator on the Sterling Transaction, learned from Eastman's investment banker that Sterling was reaching out to Faris. On January 10, Bhalla contacted Faris and invited him to meet with Eastman to discuss future work. Faris had not worked previously for Eastman. Faris accepted the invitation, and on February 23, he met with the Eastman M&A team and discussed potential opportunities. That same day, Faris and the Special Committee were finalizing Moelis' fee arrangement for its representation of the Special Committee. On February 24, the Special Committee formally retained Moelis. On February 28, after being officially hired, Faris sent Bhalla an email reiterating his desire to work with Eastman in the future.

13

On March 3, Bhalla emailed an update to Eastman executives letting them know that Faris had been hired and noting that he had met with Faris the week before. He reported that he had just spoken to Faris, who understood that "one of the things he needs to do is bring some urgency to the situation." Compl. ¶ 76.

Third, the Complaint alleges that Teeger and other sell-side fiduciaries undermined Sterling's negotiating position by making clear to Eastman that Resurgence wanted to sell. For example, On January 13, 2010, Teeger spoke with Eastman's lead negotiators, Bhalla and McDermott. He told them that "Sass was highly motivated to do a deal" because "[t]his investment is the last remaining in their 12 year old fund and that they want to close it." *Id.* ¶ 68.

Weeks later, defendant Walter Treybig, a Sterling employee, leaked detailed information to Eastman about Resurgence's motivations to sell Sterling, the sale process, Genova's desire to work for Eastman, and the likely sale price. An Eastman employee reported the information to McDermott in an email dated February 15, 2011:

> 1. Walt Treybig is interested in working for Eastman. He can't retire and go home and he likes the plant. I don't know that we have a place for him, but his long term concern for his job may be a positive influence on the way he is working for us.
>
> 2. Walt has little or no respect for Genova. He feels Genova is a control freak and is only out for himself.
>
> 3. Walt isn't sure the exit package for Genova is sufficient for him to work cooperatively with us.
>
> 4. At least one on the board recently chastised Genova for "not working on anything in the last two years except his own compensation."

14

5. Walt said the investment owners of the company entered the project in ~2000 with a 10 year window, intending to exit the investment after that time. They recently approved two one-year extensions to allow the economy to recover so the sale price would be better. If Eastman doesn't buy [Sterling], Walt feels someone will in the next couple of years due to the investor's [sic] desire to get out of this investment. The current owners didn't buy [Sterling] to own a chemical company long term.

6. If Genova becomes unwilling to negotiate, there are probably those in ownership roles (beyond the board) that would like to discuss the purchase.

7. Walt mentioned there were 3 or 4 companies interested in running the plasticizer unit . . . . There is no indication any of these are serious or viable. Walt also indicated most of what they see interested in the property are low cost bankers looking for quick money and very little idea of running a chemical company long term.

8. Genova did not want us on-site on Wednesday. What I gather from Walt is that there is a company coming in for a visit to look at some portion of the plant (perhaps the plasticizer unit, but not sure) . . . . Walt also indicated the other company was making an initial visit and had not proposed anything yet. [Sterling] doesn't know if this visit will result in anything.

9. Walt indicated the preferred stock owners would receive payout before common stock or stock option owners. Walt said the preferred stock owners get the first $110M and he did not think the business would bring more than that amount, so he (through stock options) would not see any of the sale profits. This is just an insight into what Walt believed the value of the company is currently.

These aren't discussion items for the entire group, but were shared at various times during the day. I thought these might be of interest to you.

*Id.* ¶ 80.

From this leaked information, Eastman learned key facts that it used in its negotiations with Sterling, including that Resurgence's investors wanted liquidity, that Resurgence needed to sell, and that if Genova was not cooperative, others "in ownership roles (beyond the board)" would see the transaction through. Eastman also learned it had

15

little competition because the other bidders were not strategic acquirers. Eastman even understood that Resurgence did not expect to sell Sterling for more than the liquidation preference on its preferred stock, or $110 million.

## G.    The Deal

On April 4, 2011, Teeger, Sivin, Faris, and another Moelis employee met with Bhalla and Damon Warmack of Eastman. They tentatively agreed on a sale price for Sterling of $100 million.

On May 24, 2011, the Special Committee authorized Moelis to conduct a market check. Moelis sent a one-page teaser to eighteen potential buyers. The teaser did not contain any financial information other than two numbers for Sterling's acetic acid plant. Moelis made no meaningful attempt educate potential buyers about the value of the Texas City site. Moelis also did not explore selling discrete assets to multiple buyers, even though Moelis knew that many parties were interested in specific Sterling assets.

Despite the minimal information, two of the parties that Moelis contacted expressed interest. Only nine of the eighteen that Moelis contacted said they had no interest. Sterling also received expressions of interest from parties that Moelis had not contacted. The Special Committee and Moelis told the interested parties to act quickly.

## H.    The Sterling Transaction

On June 17, 2011, Eastman received a call from the financial press about the Sterling Transaction. Recognizing that word had leaked, Bhalla told Teeger that the deal had to be signed and announced that weekend.

16

The Special Committee and Moelis were not prepared to meet that deadline. Among other things, the Special Committee had yet to negotiate—and Moelis had yet to evaluate—what portion of the merger consideration Sterling's minority stockholders would receive. Just two days earlier, on June 15, 2011, Teeger had emailed Genova saying, "So far I have nothing from Moelis so I cannot yet sit down with ram." Compl. ¶ 103. At that time, Teeger was in Germany, and Gildea was in Belgium, making it difficult to organize meetings. On Saturday, June 18, after receiving Bhalla's demand to sign that weekend, Crump emailed Teeger and Gildea: "Guys—I don't know what to suggest to get this process under control, but we have a mess on our hands." *Id.* ¶ 102.

Despite lacking any materials from Moelis, Teeger entered into discussions with Resurgence. On Sunday, June 19, Teeger summarized the discussions for his colleagues on the Special Committee:

> This is to confirm that I held a meeting with Phil Sivin on June 8 and we discussed the amount per share that the minority shareholders should receive out of the proceeds of a sale of Sterling. We set out our current thinking but did not reach a conclusion.

> On June 16 I met with Phil Sivin and Karl Shwarztfeld [sic] and we discussed further the amount per share that the minority shareholders in Sterling should receive. I await the views of The [sic] spec comm and Moelis before attempting to finalize the negotiation with RAM . . . As a prelude to these views it is helpful to know that RAM considers that $1 per share is the right amount.

*Id.* ¶104. There is obvious tension between Teeger's statement on June 15 that he could not enter into discussions with Resurgence because he had not yet received materials from Moelis and Teeger's claim on June 19 to have engaged in precisely those types of discussions on June 8 and 18.

17

Teeger told Bhalla that Sterling would not be able to meet the Monday deadline. *Id.* ¶105. Teeger finally received presentation materials from Moelis after 6 pm Eastern time Monday, June 20, 2011, which was after midnight in Germany where Teeger was.

On Tuesday, June 21, 2011, Teeger sent the following email to the full Board, including the directors affiliated with Resurgence:

> Met last evening and went thru the Moelis presentation ending up with an instreuction [sic] for me to speak to RAM
>
> I spoke with Phil Sivin and we are negotiating a split of the proceeds of the eastman [sic] transaction

*Id.* ¶107. Gildea responded, "good show." *Id.*

The negotiations must have concluded quickly. Later that day, Teeger sent the Special Committee and Moelis a final update: "Price is $2.50 per share." *Id.* ¶ 108.

## I.     The Fairness Opinion

On June 21, 2011, Moelis provided the Special Committee with its opinion that $2.50 per share was fair from a financial perspective to Sterling's minority stockholders. The Complaint alleges that Moelis manipulated its supporting financial analysis to undervalue Sterling and make the Sterling Transaction appear fair. Among other things, Moelis used a discount rate of 18%, nearly double the discount rates used internally by Sterling (10%) and Eastman (9.75%). Moelis also used an implied terminal multiple of approximately 3x, even though comparables supported a range of 6.4x to 9.0x. Moelis attributed no value to Sterling's plasticizer facility, which was the key asset Eastman was buying.

The $100 million price that Moelis endorsed contrasted with other indications of value. In December 2010, Genova prepared materials valuing Sterling between $129 and $431 million, excluding the plasticizer facility and underutilized assets, and between $314 and $616 million, including those assets. In March 2011, Genova valued Sterling at $185 to $195 million, excluding the plasticizer facility and other underutilized assets. The earlier Gulf Hydrogen bid had been $392 million, and the D.E. Shaw bid proposal was in the range of $300 to $350 million.

## J.    The Sterling Transaction Closes

On June 22, 2011, Sterling entered into an agreement and plan of merger (the "Merger Agreement" or "MA") with Eastman and Eastman TC, Inc., a wholly owned acquisition subsidiary ("Eastman Sub"). The Merger Agreement called for Sterling to merge with Eastman Sub and become a wholly owned subsidiary of Eastman (the "Merger"). Resurgence provided the necessary stockholder approval in the form of a Written Consent and Voting Agreement, dated as of June 22, 2011 (the "Written Consent"), that Sass executed. The minority stockholders did not vote on the Merger.

On July 19, 2011, Sterling sent an information statement to its stockholders containing information about the Merger and notifying them of their statutory appraisal rights. The Complaint alleges that the information statement contained materially false and misleading statements and omissions. The Merger closed on August 9.

**K.     Procedural History**

On October 19, 2011, plaintiff Virtus Capital L.P. ("Virtus") filed an appraisal proceeding. In the appraisal action, Virtus obtained the discovery that forms the basis for the Complaint's allegations. On June 20, 2014, Virtus filed this plenary action.

The Complaint contains seven counts:

● Count I alleges that Resurgence, as Sterling's controlling stockholder, breached its fiduciary duties by causing Sterling to be sold to satisfy Resurgence's idiosyncratic needs for liquidity, resulting in an unfair transaction at an unfair price. The defendants comprising Resurgence for purposes of this claim are Sass, the Resurgence Funds, the RAM Entities, and Sass Services.

● Count II advances the same basic theory against the members of the Board affiliated with Resurgence.

● Count III alleges that that the members of the Special Committee breached their fiduciary duties by facilitating and approving the Merger.

● Count IV alleges that Genova breached his fiduciary duties as both an officer and a director by facilitating and approving the Merger.

● Count V alleges that Treybig breached his fiduciary duties as an officer by leaking information to Eastman to serve his personal interests.

● Count VI alleges that Eastman and Eastman Sub aided and abetted the members of the Board, Genova, and Treybig in their breaches of duty.

● Count VII alleges that Moelis aided and abetted Resurgence, the members of the Board, and Treybig in their breaches of duty.

On August 28, 2014, Sass and the Sass Plan moved to dismiss the Complaint on the grounds that this court lacked personal jurisdiction over them.

## II.     LEGAL ANALYSIS

A defendant may move to dismiss a complaint for lack of personal jurisdiction. Ct. Ch. R. 12(b)(2). "Generally, a plaintiff does not have the burden to plead in its complaint facts establishing a court's personal jurisdiction over defendant." *Benerofe v. Cha*, 1996

20

WL 535405, at *3 (Del. Ch. Sept. 12, 1996). However, "[w]hen a defendant moves to dismiss a complaint pursuant to Court of Chancery Rule 12(b)(2), the plaintiff bears the burden of showing a basis for the court's exercise of jurisdiction over the defendant." *Ryan v. Gifford*, 935 A.2d 258, 265 (Del. Ch. 2007). "In ruling on a Rule 12(b)(2) motion, the court may consider the pleadings, affidavits, and any discovery of record." *Id.* "If . . . no evidentiary hearing has been held, plaintiffs need only make a *prima facie* showing of personal jurisdiction and the record is construed in the light most favorable to the plaintiff." *Id.* (footnotes and quotation marks omitted).

To analyze a Rule 12(b)(2) motion, a Delaware trial court applies a two-part test:

First, the court must determine whether Delaware's long arm statute, 10 *Del. C.* § 3104(c), is applicable. If so, the court must decide whether subjecting the nonresident defendant to jurisdiction would violate due process. Under settled law, a nonresident defendant must have sufficient minimum contacts with the forum state such that the maintenance of the suit does not offend traditional notions of fair play and substantial justice.

*Matthew v. Fläkt Woods Gp. SA*, 56 A.3d 1023, 1027 (Del. 2012) (internal quotation marks and alterations omitted). *See generally* Donald J. Wolfe, Jr. & Michael A. Pittenger, *Corporate and Commercial Practice in the Delaware Court of Chancery* § 3.02 (2013).

The Delaware Long-Arm Statute provides:

(c) As to a cause of action brought by any person arising from any of the acts enumerated in this section, a court may exercise personal jurisdiction over any nonresident, or a personal representative, who in person or through an agent: (1) Transacts any business or performs any character of work or service in the State . . . .

10 *Del. C.* § 3104(c)(1). "[A] single transaction is sufficient to confer jurisdiction where the claim is based on that transaction." *Crescent/Mach I P'rs, L.P. v. Turner*, 846 A.2d 963, 978 (Del. Ch. 2000) (internal quotation marks and footnote omitted); *accord LaNuova D & B SpA v. Bowe Co., Inc.*, 513 A.2d 764, 768 (Del. 1986). Under the plain language of the Long-Arm Statute, forum-directed activity can be accomplished "through an agent." 10 *Del. C.* § 3104(c).

Section 3104(c) is to be "broadly construed to confer jurisdiction to the maximum extent possible under the Due Process Clause." *Hercules Inc. v. Leu Trust & Banking (Bahamas) Ltd.*, 611 A.2d 476, 480 (Del. 1992); *accord LaNuova*, 513 A.2d at 768.

> [T]rial courts must give a broad reading to the terms of the long-arm statute[] in order to effectuate the statute's intent to ensure that this state's court may exercise jurisdiction to the full limits permissible under the Due Process Clause. In other words, the Supreme Court has instructed that trial courts should permit service under § 3104 if the statutory language plausibly permits service, and rely upon a Due Process analysis to screen out uses of the statute that sweep too broadly.

*Sample v. Morgan (Sample II)*, 935 A.2d 1046, 1056 (Del. Ch. 2007) (Strine, V.C.) (footnotes omitted)

For purposes of the due process analysis, "[t]he well-established point of departure is that certain minimum contacts must exist between a State and a nonresident defendant before that State can exercise personal jurisdiction over him." *Moore v. Little Giant Indus., Inc.*, 513 F. Supp. 1043, 1048 (D. Del. 1981), *aff'd*, 681 F.2d 807 (3d Cir. 1982) (internal quotation marks omitted). The question is whether the defendants had sufficient minimum contacts with Delaware such that "compelling [them] to defend [themselves] in the State would be consistent with the traditional notions of fair play and substantial

22

justice[.]" *Waters v. Deutz Corp.*, 479 A.2d 273, 276 (Del. 1984) (internal quotation marks omitted).

The Delaware Supreme Court has adopted what is known as the conspiracy theory of jurisdiction. *Fläkt Woods*, 56 A.3d at 1027. Under this theory,

> a conspirator who is absent from the forum state is subject to the jurisdiction of the court, assuming he is properly served under state law, if the plaintiff can make a factual showing that: (1) a conspiracy to defraud existed; (2) the defendant was a member of that conspiracy; (3) a substantial act or substantial effect in furtherance of the conspiracy occurred in the forum state; (4) the defendant knew or had reason to know of the act in the forum state or that acts outside the forum state would have an effect in the forum state; and (5) the act in, or effect on, the forum state was a direct and foreseeable result of the conduct in furtherance of the conspiracy.

*Istituto Bancario Italiano SpA v. Hunter Eng'g Co.*, 449 A.2d 210, 225 (Del. 1982). The theory "is based on the legal principle that one conspirator's acts are attributable to the other conspirators." *Fläkt Woods*, 56 A.3d at 1027. Thus, "if the purposeful act or acts of one conspirator are of a nature and quality that would subject the actor to the jurisdiction of the court, all of the conspirators are subject to the jurisdiction of the court." *Istituto Bancario*, 449 A.2d at 222.

Delaware decisions have not explained consistently how the conspiracy theory corresponds to the two-prong jurisdictional test. *See* Wolfe & Pittenger, § 3.04[b], at 3-87 (describing approaches). In my view, the five elements of the *Istituto Bancario* test functionally encompass both prongs of the jurisdictional test. The first three *Istituto Bancario* elements address the statutory prong of the test. The fourth and fifth *Istituto Bancario* elements address the constitutional prong of the test.

23

The first three *Istituto Bancario* elements encompass the statutory prong by speaking to the requirements of the Delaware Long-Arm Statute. The third *Istituto Bancario* element—whether a "substantial act or substantial effect in furtherance of the conspiracy occurred in the forum state"—corresponds to the statutory requirement that the defendant have transacted business or performed work in the State. The first and second *Istituto Bancario* elements—the existence of a conspiracy and the defendant's membership in it—provide grounds for imputing the jurisdiction-conferring act to the defendant under agency principles, because "conspirators are considered agents for jurisdictional purposes." *Hercules*, 611 A.2d at 481; *accord Carlton Invs. v. TLC Beatrice Int'l Hldgs., Inc.*, 1995 WL 694397, at *12 (Del. Ch. Nov. 21, 1995) (Allen, C.). It remains true that the conspiracy theory itself is not an independent basis for jurisdiction that alleviates the need to establish a statutory hook in Section 3104. *Hercules*, 611 A.2d at 482 n.6. But the first, second, and third *Istituto Bancario* elements correspond sufficiently with the requirements of Section 3104 such that satisfying the former accomplishes the latter.

Analytical overlap is equally present for the constitutional prong. The fourth and fifth *Istituto Bancario* elements—whether the defendant "knew or had reason to know of" the forum-directed activity and the degree to which the forum-directed activity was "a direct and foreseeable result of the conduct in furtherance of the conspiracy"—speak to due process and whether there are sufficient minimum contacts between the defendant and the forum such that the defendant could reasonably anticipate being sued there. *See Carlton Invs.*, 1995 WL 694397, at *12. "[A] defendant who has so voluntarily

24

participated in a conspiracy with knowledge of its acts in or effects in the forum state can be said to have purposefully availed himself of the privilege of conducting activities in the forum state, thereby fairly invoking the benefits and burdens of its laws." *Istituto Bancario*, 449 A.2d at 225. The "participation is a substantial contact with the jurisdiction of a nature and quality that it is reasonable and fair to require the defendant to come and defend an action there." *Id.*; *accord Hercules*, 611 A.2d at 482 n.6 (explaining that the conspiracy theory "provides a framework with which to analyze a foreign defendant's contacts with Delaware").

In my view, therefore, if a plaintiff can address satisfactorily all five elements of the conspiracy theory, then the plaintiff will have met both prongs of the jurisdictional test. This decision therefore uses the conspiracy theory as the framework for analysis.

## A. Jurisdiction Over Sass

Under the conspiracy theory, acts taken in the State of Delaware in connection with the Sterling Transaction can be attributed to Sass for purposes of Section 3104(c)(1), and it is consistent with due process for the plaintiff to have sued him in Delaware in connection with the Sterling Transaction. Sass' motion to dismiss is denied.

### 1. Sass' Role In The Conspiracy

The first and second *Istituto Bancario* elements ask whether a conspiracy existed and whether the defendant was a member of the conspiracy. 449 A.2d at 225. Although *Istituto Bancario* literally speaks in terms of a "conspiracy to defraud," the principle is

25

not limited to that particular tort.[1] "[I]n cases involving the internal affairs of corporations, aiding and abetting claims represent a context-specific application of civil conspiracy law." *Allied Capital Corp. v. GC-Sun Hldgs., L.P.*, 910 A.2d 1020, 1038 (Del. Ch. 2006); *accord Weinberger v. Rio Grande Indus., Inc.*, 519 A.2d 116, 131 (Del. Ch. 1986). Sufficiently pleading a claim for breach of fiduciary duty and a related claim for aiding and abetting a breach of fiduciary duty satisfies the first and second elements of the *Istituto Bancario* test. *Benihana of Tokyo, Inc. v. Benihana, Inc.*, 2005 WL 583828, at *7 (Del. Ch. Feb. 4, 2005); *Crescent/Mach I*, 846 A.2d at 977.

The Complaint adequately pleads that Sass and his fellow-fiduciary defendants breached their duty of loyalty in connection with the Sterling Transaction and that the non-fiduciary defendants aided and abetted the breach. The Complaint goes beyond alleging that Sass was a part of the conspiracy; it alleges that he was the top dog and ring leader. According to the Complaint, Sass used his control over the Resurgence Funds, RAM Entities, and Sass Services to sell Sterling on the cheap. He caused Sterling to be sold at a fire-sale price because Resurgence needed liquidity. The Complaint does not advance these claims in conclusory fashion, nor does it rely on generic statements about the market pressures that confront fund managers or the consequences of limited-term

---

[1] *See id.* at 222-25 (describing underlying theory without fraud-based limitation); *Carsanaro v. Bloodhound Techs., Inc.*, 65 A.3d 618, 635-36 (Del. Ch. 2013) (noting that theory encompasses claims of breach of fiduciary duty and aiding and abetting); *Hamilton P'rs v. Englard*, 11 A.3d 1180, 1197 (Del. Ch. 2010) (same); *Crescent/Mach I*, 846 A.2d at 977 (rejecting construction of *Istituto Bancario* that would require a "specific allegation that [the defendants] agreed to conspire 'to defraud' minority stockholders").

funds and short investment horizons. The Complaint describes the losses, redemption requests, and fund expirations that squeezed Resurgence, and it quotes from myriad emails between Sass, Teeger, Sivin, and Schwarzfeld in which they discussed, among other things, the "need for a strong focus on finding an acquirer to monetize RAM's investment" and their desire to "monetize Sterling asap." Compl. ¶¶ 33, 36; *see also id.* ¶¶ 35, 47-48. The Complaint also cites actions that Sass took to further his desire for liquidity, such as causing Teeger to join the Board and take charge of the sale process, and ensuring that Genova was focused on a near-term sale and incentivized to pursue one.

For his part, Sass argues that "[t]he emails attributed to [him] are not directed to anyone in Delaware." Sass Br. at 15. True, but irrelevant. The emails themselves do not have to be the Delaware-directed acts. The emails support the existence of the conspiracy and Sass' role in it, satisfying the first and second elements of the *Istituto Bancario* test.

### 2.     The Forum-Related Acts

The third *Istituto Bancario* element asks whether "a substantial act or substantial effect in furtherance of the conspiracy occurred in the forum state." 449 A.2d at 225. Forming a Delaware entity to facilitate a challenged transaction satisfies this element.[2] So

---

[2] *E.g., Papendick v. Robert Bosch GmbH*, 410 A.2d 148, 152 (Del. 1979); *Reid v. Siniscalchi*, 2014 WL 6589342, at *10 (Del. Ch. Nov. 20, 2014); *Microsoft Corp. v. Amphus, Inc.*, 2013 WL 5899003, at *9 (Del. Ch. Oct. 31, 2013); *Conn. Gen. Life Ins. Co. v. Pinkas*, 2011 WL 5222796, at *2 (Del. Ch. Oct. 28, 2011); *Cairns v. Gelmon*, 1998 WL 276226, at *3 (Del. Ch. May 21, 1998). *See generally* Wolfe & Pittenger, *supra*, § 3.04[c][3], at 3-103 ("in suits in which the incorporation of a Delaware subsidiary is an integral component of the conduct giving rise to the cause of action, the Delaware courts

27

does filing a corporate instrument in Delaware in connection with the challenged transaction.[3]

The Complaint identifies two instances of Delaware-related activities, each independently sufficient to satisfy the third *Istituto Bancario* element and provide the statutory prerequisite for jurisdiction under Section 3104(c)(1). The first instance of Delaware-related activity was the formation of the Delaware entities to serve as liquidating vehicles. "When done as an integral part of a wrongful scheme, the formation of a Delaware entity confers personal jurisdiction under the long-arm statute." *Reid*, 2014 WL 6589342, at *10. The Complaint alleges that Sass caused the liquidating vehicles to be formed in November 2010, after Resurgence had suffered significant losses and redemption requests, after Sass had discussed with Teeger the importance of monetizing Sterling to meet Resurgence's liquidity needs, after Teeger joined the Board, and after a monetization strategy was put in motion.

---

have consistently recognized that a nonresident defendant's incorporation of such subsidiary constitutes constitutionally sufficient 'minimum contacts' with Delaware." ).

[3] *E.g.*, *Fläkt Woods*, 56 A.3d at 1027 (certificate of cancellation); *Carsanaro*, 65 A.3d at 635 (various certificates required by DGCL for challenged transactions, including certificates of amendment, certificates of designation, certificates of correction, and certificate of cancellation); *Benihana*, 2005 WL 583828, at *8 (certificate of designations); *Gibralt Capital Corp. v. Smith*, 2001 WL 647837, at *6 (Del. Ch. May 9, 2001) (certificate of designations); *Crescent/Mach I*, 846 A.2d at 977 (certificate of merger). *See generally* R. Franklin Balotti & Jesse A. Finkelstein, *The Delaware Law of Corporations and Business Organizations* § 13.4[B], at 13-13 (3 ed. 2014) ("[t]he filing of corporate instruments with the Delaware Secretary of State may also constitute an action in Delaware sufficient to support jurisdiction").

Sass has argued that any connection between the formation of the liquidating vehicles and the Sterling Transaction is too attenuated to support jurisdiction. At the pleadings stage, the plaintiff receives the benefit of the reasonable inference that Sass used the liquidating vehicles to maintain control of Sterling as part of his efforts to obtain liquidity for Resurgence. Sass did not have to create the liquidating vehicles; Fund I, Fund II, and the International Fund could have distributed their Sterling holdings to their investors. But if Sass had chosen that route, then he would have given up his control over a majority of Sterling's outstanding voting power and could not have caused the various Resurgence entities to approve the Sterling Transaction through action by written consent. The Complaint sufficiently alleges that forming the liquidating vehicles was an integral part of the process that led to the Sterling Transaction.

The second instance of Delaware-related activity was the filing of the certificate of merger for the Sterling Transaction with the Delaware Secretary of State. Eastman formed Eastman Sub as a Delaware-sitused acquisition vehicle. The parties took advantage of Delaware law by agreeing to merge Sterling with Eastman Sub, with Sterling emerging as a wholly owned subsidiary of Eastman. The filing of the certificate of merger in Delaware consummated the transaction.

As to the certificate, Sass argues that because Eastman actually filed it, and because Eastman was the acquirer on the opposite side of the deal from Sass, the filing cannot be attributed to Sass for jurisdictional purposes. The Delaware Supreme Court has held on at least three occasions that "one conspirator's acts are attributable to the other conspirators." *Fläkt Woods*, 56 A.3d at 1027; *accord Hercules*, 611 A.2d at 481; *Istituto*

29

*Bancario*, 449 A.2d at 222. The filing of the certificate of merger is therefore attributable to Sass.

### 3. Knowledge Of The Forum-Related Acts

The fourth and fifth *Istituto Bancario* elements evaluate whether "the defendant knew or had reason to know of the act in the forum state" and the degree to which "the act in . . . the forum state was a direct and foreseeable result of the conduct in furtherance of the conspiracy." 449 A.2d at 225. In substance, these elements require allegations "from which one can infer that a foreign defendant knew or should have known that the conspiracy would have a Delaware nexus." *Fläkt Woods*, 56 A.3d at 1024. Actual knowledge is not required; "the applicable standard is whether the foreign [defendant] knew or should have known [about the] activity in Delaware." *Id.*

At the current procedural stage, it is readily inferable that Sass knew or should have known that the Sterling Transaction had a Delaware nexus. Sterling was a Delaware corporation, and the Merger Agreement called for Sterling would merge with another Delaware corporation. Sass signed the Written Consent to satisfy the stockholder approval requirement for the Sterling Transaction. Sass thus personally provided the stockholder approval that was necessary for the Sterling Transaction to close and for the certificate of merger to be filed with the Delaware Secretary of State.

This court's exercise of personal jurisdiction over Sass comports with due process. *See Istituto Bancario*, 449 A.2d at 225. Sass is no neophyte. Since 1972, he has formed over seventy entities in Delaware, fifty-six of which bear his name. As the financially sophisticated principal of an investment fund complex, he certainly should have

30

anticipated that his orchestration of a merger involving a Delaware entity that he controlled, including the formation of Delaware liquidating vehicles to preserve his control, could render him subject to the jurisdiction of the Delaware courts for purposes of challenges to the transaction. Having engaged in conduct that involved the formation of Delaware entities, the use of Delaware law, and the filing of a certificate of merger with the Delaware Secretary of State to accomplish his purposes, Sass should have "reasonably anticipated . . . that his . . . actions might result in the forum state asserting personal jurisdiction over him in order to adjudicate disputes arising from those actions." *In re USACafes, L.P. Litig.*, 600 A.2d 43, 50-51 (Del. Ch. 1991) (Allen, C.). "Sophisticated investors should reasonably expect to face suit in Delaware when they place their employees or principals on the board of directors of a Delaware corporation, then allegedly use those representatives to channel benefits to themselves through . . . transactions that require acts in Delaware for their implementation." *Carsanaro*, 65 A.3d at 636.

### 4. The Corporate Veil As A Jurisdictional Defense

Sass alternatively argues that because he only acted through other entities, such as Sass Services, he cannot be subject to personal jurisdiction in Delaware for a breach of fiduciary duty claim, because to do so would disregard the separate existence of his entities. Sass equates this result to piercing the corporate veil, and he contends that the Complaint does not contain allegations sufficient for piercing. This contention is really an argument that the Complaint fails to state a claim against Sass personally, but it is dressed in jurisdictional garb. The argument fails because it tries to deploy principles of corporate

31

separateness that govern claims brought by third parties as a shield against fiduciary accountability.

The doctrine of piercing the corporate veil enables contract creditors to reach the assets of the owners of an entity if they can meet a multi-factor test. The doctrine is also available to tort claimants.[4] The doctrine traditionally has not been applied to claims for breach of fiduciary duty brought by stockholders against the human actors who control their corporation. To the contrary, a cause of action against the actual humans is a centerpiece of corporate law. Delaware law endows the board of directors with the authority and concomitant duty to manage a Delaware corporation. *See* 8 *Del. C.* § 141(a). The directors of a Delaware corporation must be natural persons. *See* 8 *Del. C.* § 141(d). Those individuals owe fiduciary duties of loyalty and care to the corporation, which require that the directors exercise their managerial authority on an informed basis in the good faith pursuit of maximizing the value of the corporation for the benefit of its residual claimants, *viz.*, the stockholders.[5] When stockholders contend that the directors

---

[4] *See Feeley v. NHAOCG, LLC*, 62 A.3d 649, 667 (Del. Ch. 2012); Robert B. Thompson, *The Limits of Liability in the New Limited Liability Entities*, 32 Wake Forest L. Rev. 1, 9-12 (1997); *see also* Robert B. Thompson, *Piercing the Corporate Veil: An Empirical Study*, 76 Cornell L. Rev. 1036, 1058 (1991) (reviewing statistical occurrence of piercing cases based on an underlying tort).

[5] *See N. Am. Catholic Educ. Programming Found., Inc. v. Gheewalla*, 930 A.2d 92, 101 (Del. 2007) ("The directors of Delaware corporations have 'the legal responsibility to manage the business of a corporation for the benefit of its shareholder[] owners.'" (quoting *Malone v. Brincat*, 722 A.2d 5, 9 (Del. 1998))); *Unocal Corp. v. Mesa Petroleum Co.*, 493 A.2d 946, 955 (Del. 1985) (citing "the basic principle that corporate directors have a fiduciary duty to act in the best interests of the corporation's stockholders"); *eBay Domestic Hldgs., Inc. v. Newmark*, 16 A.3d 1, 34 (Del. Ch. 2010)

breached their fiduciary duties, they can assert a cause of action (directly or derivatively) against natural persons without having to seek to pierce the corporate veil.

Breach of fiduciary duty is an equitable claim, and it is a maxim of equity that "equity regards substance rather than form." *Monroe Park v. Metro. Life Ins. Co.*, 457 A.2d 734, 737 (Del. 1983); *accord Gatz v. Ponsoldt*, 925 A.2d 1265, 1280 (Del. 2007)

---

(explaining that directors have a fiduciary duty "to promote the value of the corporation for the benefit of its stockholders"); *see also* Leo E. Strine, Jr., *Our Continuing Struggle with the Idea that For-Profit Corporations Seek Profit*, 47 Wake Forest L. Rev. 135, 147 n.34 (2012) ("[S]tockholders' best interest must always, within legal limits, be the end. Other [corporate] constituencies may be considered only instrumentally to advance that end."); Leo E. Strine, Jr. et al., *Loyalty's Core Demand: The Defining Role of Good Faith in Corporation Law*, 98 Geo. L.J. 629, 634 (2010) ("[I]t is essential that directors take their responsibilities seriously by actually trying to manage the corporation in a manner advantageous to the stockholders.").

The fiduciary obligation to maximize the value of the corporation for the benefit of its stockholders does not mean that directors must sacrifice greater value that can be achieved over the long term in pursuit of short-term strategies, and it certainly does not mean that directors must attempt to maximize the a public company's stock price on a daily or quarterly basis. The fiduciary relationship requires that directors act prudently, loyally, and in good faith to maximize the corporation's value over the long-term for its stockholders' benefit. *See, e.g.*, *Gantler v. Stephens*, 965 A.2d 695, 706 (Del. 2009) (holding that "enhancing the corporation's long term share value" is a "distinctively corporate concern[]"); *TW Servs., Inc. v. SWT Acq. Corp.*, 1989 WL 20290, at *7 (Del. Ch. Mar. 2, 1989) (Allen, C.) (describing as "non-controversial" the proposition that "the interests of the shareholders as a class are seen as congruent with those of the corporation in the long run" and explaining that "[t]hus, broadly, directors may be said to owe a duty to shareholders as a class to manage the corporation within the law, with due care and in a way intended to maximize the long run interests of shareholders"); *see also* Andrew A. Schwartz, *The Perpetual Corporation*, 80 Geo. Wash. L. Rev. 764, 777-83 (2012) (arguing that the corporate attribute of perpetual existence calls for a fiduciary mandate of long-term value maximization for the stockholders' benefit); William T. Allen, *Ambiguity in Corporation Law*, 22 Del. J. Corp. L. 894, 896-97 (1997) ("[I]t can be seen that the proper orientation of corporation law is the *protection of long-term value of capital* committed indefinitely to the firm.").

("It is the very nature of equity to look beyond form to the substance of an arrangement."). Courts applying equitable principles therefore have had little difficulty extending liability for breach of fiduciary duty beyond the natural persons who served as directors to outsiders like majority stockholders who effectively controlled the corporation. *See, e.g., S. Pac. Co. v. Bogert*, 250 U.S. 483, 488 (1919); *Sterling v. Mayflower Hotel Corp.*, 93 A.2d 107, 298 (Del. 1952). Delaware corporate decisions consistently have looked to who wields control in substance and have imposed the risk of fiduciary liability on the actual controllers.[6]

---

[6] *See Kahn v. Lynch Commc'n Sys. Inc.*, 638 A.2d 1110, 1114 (Del. 1994) (holding that 43% stockholder that exercised actual control over subsidiary could be liable for breach of fiduciary duty); *Sterling*, 93 A.2d at 109-10 (citing "the settled rule of law that Hilton as majority stockholder of Mayflower and the Hilton directors as its nominees occupy, in relation to the minority, a fiduciary position in dealing with Mayflower's property"); *Keenan v. Eshleman*, 2 A.2d 904, 908 (Del. 1938) (affirming imposition of liability on directors for management fees paid by corporation to second corporation that was its controlling stockholder, where directors also controlled the controlling stockholder: "The conception of corporate entity is not a thing so opaque that it cannot be seen through; and, viewing the transaction as one between corporations, casual scrutiny reveals that the appellants, in fact, dealt with themselves to their own advantage and enrichment. The employment of Consolidated by Sanitary was merely the employment by the appellants of themselves to do what it was their plain duty to do as officers of Sanitary."); *Shandler v. DLJ Merch. Banking, Inc.*, 2010 WL 2929654, at *15 (Del. Ch. July 26, 2010) (Strine, V.C.) ("Fairly read, the complaint alleges that DLJ, Inc. presided over a family of entities that it dominated and controlled, including the entities that together owned 74% of Insilco's equity. Using their unified power in a concerted way, DLJ controlled Insilco and directed its business strategy, including causing it to employ the DLJ Advisors . . . . I believe that Shandler has pled sufficient facts from which it can be inferred that the DLJ Funds were instrumentalities operated for the benefit of DLJ, Inc. and DLJMB."); *In re Primedia, Inc. Deriv. Litig.*, 910 A.2d 248, 258 n.26 (Del. Ch. 2006) (holding that private equity firm could owe fiduciary duties to non-controlling stockholders when firm controlled corporation through intervening entities); *Allied Chem. & Dye Corp. v. Steel & Tube Co.*, 120 A. 486, 491 (Del. Ch. 1923) ("When, in the conduct of the corporate business, a majority of the voting power . . . join hands in

34

Sass wields control in substance, and Sterling's stockholders can sue him personally for breach of fiduciary duty because he was the controller and ultimate fiduciary of Sterling. The Complaint states a claim for breach of fiduciary duty against Sass; the question raised by his Rule 12(b)(2) motion is whether he could be sued in Delaware, or whether he only could be sued in California, where he resides. As discussed in the preceding section, jurisdiction-conferring acts in the State of Delaware are attributable to Sass, and it is fair as a matter of due process to hale him into this court.

In arguing that the entities he controls should screen him from being subject to personal jurisdiction in this court, Sass relies on *Ruggiero v. FuturaGene, plc*, 948 A.2d 1124 (Del. Ch. 2008). In that decision, an English corporation (FuturaGene) used a Delaware acquisition vehicle to acquire an Indiana corporation through a reverse-triangular merger. The separate existence of the Delaware acquisition vehicle ceased as a result of the merger, leaving the Indiana target as a wholly owned subsidiary of FuturaGene. *Id.* at 1129. As merger consideration, the former stockholders of the Indiana target received shares representing approximately 30% of FutureGene's voting power, as well as the right to additional shares in the form of earn-out payments. *Id.* at 1129-30.

---

imposing its policy upon all, it is beyond all reason . . . to take any view other than that they are to be regarded as having placed upon themselves the same sort of fiduciary character which the law impresses upon the directors in their relation to all the stockholders."); *Martin v. D.B. Martin Co.*, 88 A. 612, 615 (Del. Ch. 1913) ("For the protection of the rights of stockholders of the dominant, or parent company, and for righting of wrongs done them by means of the control of the dominant, or parent, company . . . the latter are to be treated as agents of the former, or even as identical with each other.").

Litigation ensued over the earn-out, and the former stockholders of the Indiana target, now stockholders of FuturaGene, asserted claims for breach of contract and breach of fiduciary duty against FuturaGene and its directors.

FuturaGene had consented in the merger agreement to jurisdiction in the Court of Chancery. The directors of FuturaGene were not parties to that agreement, and the decision held that they were not bound by the forum selection provision. *Id.* at 1132. The court also held that as directors of an English corporation, the individual defendants were not subject to jurisdiction under Delaware's director-consent statute, 10 *Del. C.* § 3114. Nor had they taken any action during their transitory tenure as directors of the Delaware acquisition subsidiary that would support jurisdiction under Section 3114. *Ruggiero*, 948 A.2d at 1134.

This left Section 3104(c)(1) and the creation of the Delaware acquisition subsidiary as the only potential jurisdictional hook. That theory failed for two reasons. For one, the creation of the Delaware acquisition subsidiary did not provide the basis for the plaintiffs' claims, which alleged post-closing breaches of contractual and fiduciary duty that led to the failure to issue earn-out shares. For another, the plaintiffs had not alleged any facts suggesting that the individual defendants took action other than as directors of a foreign corporation. As the court explained,

> a corporate director or officer of a foreign corporation cannot be haled into a Delaware court for an act of the corporation simply because the officer or director has directed the corporation to take that act . . . . Rather, the corporate officer or director must be shown to have substantial contacts in Delaware or with a nexus to Delaware having a clear relationship to the cause of action.

36

*Ruggiero*, 948 A.2d at 1134. Alternatively, the plaintiffs would have had to show that FuturaGene functioned as the directors' agent so that Section 3104(c)'s language about "action through an agent" would apply. *Id.* at 1134-35. The complaint in *Ruggiero* did neither.

Notably, the *Ruggiero* decision did not involve claims for breach of fiduciary duty brought by stockholders of a Delaware corporation against its controller. The principal claims in *Ruggiero* were breach of contract claims, where piercing doctrine ordinary applies, and the fiduciary duty claims recast the breach of contract claims in fiduciary guise. Nor did the decision in *Ruggiero* suggest a degree of involvement comparable to Sass' role in the Sterling Transaction.

Other Delaware decisions support the existence of personal jurisdiction over an individual defendant for purposes of breach of fiduciary duty claims involving a Delaware corporation where the individual was alleged to have been involved actively in the transactions that resulted in jurisdiction-conferring acts taking place in the State of Delaware. For example, in *Microsoft Corp. v. Amphus, Inc.*, 2013 WL 5899003 (Del. Ch. Oct. 31, 2013), this court exercised personal jurisdiction over an individual defendant based on his involvement in the creation of a Delaware subsidiary, despite the defendant's argument that he acted only as an officer and director of the foreign parent that technically formed the Delaware subsidiary. Distinguishing *Ruggiero* and similar cases, the court explained its reasoning as follows:

> Fung did not merely vote, as a director of Vadem BVI [the foreign parent entity], to approve the formation of Amphus [the Delaware entity]. Fung proposed the creation of Amphus to the [parent] Board. He further

37

proposed that he would be a founder, director, and the CEO of Amphus and also would have a twenty percent stake in the new entity, thereby nearly tripling his personal interest in the Vadem Patents. Furthermore, the Complaint contains allegations sufficient to make a *prima facie* showing that Fung made his proposal to the Vadem Board for the purpose of securing the future benefits of the Vadem Patents for himself at an unfair price, and that Fung deliberately misled the Vadem Board to achieve that goal. In sum, Microsoft has alleged that Fung purposefully harmed Vadem BVI and purposefully availed himself of the laws of Delaware by choosing to induce Vadem BVI to create a Delaware entity that Fung could use to facilitate his wrongdoing. Under the facts alleged in this case, therefore, Fung's conduct went beyond mere approval of the creation of Amphus as a director of Vadem BVI to his orchestrating that action and subsequently using Amphus to facilitate his wrongful scheme. Accordingly, I find that Fung is subject to personal jurisdiction in Delaware under 10 *Del. C.* § 3104(c)(1) and that the exercise of jurisdiction over him under that statute comports with Due Process.

*Id.* at \*10. The court declined to exercise personal jurisdiction over a second director who had not played a similarly meaningful role. As to that director, the complaint "lack[ed] any suggestion that [he] had the ability to control the Vadem BVI Board or was aware of Fung's alleged scheme." *Id.* The complaint therefore did not provide any basis to hold him accountable in Delaware for his actions as a director of a foreign corporation. *Id.*

Another example is *Sample v. Morgan*. That litigation involved a transaction in which the directors of a Delaware corporation issued shares representing nearly one third of the corporation's equity capitalization to its three top managers, who also composed a majority of the five-member board. To facilitate the issuance, the board recommended and sought stockholder approval of an amendment to the corporation's certificate of incorporation that reduced the par value of the shares, enabling the top managers to pay $200 for the equity instead of $200,000. After the stockholders approved the amendment, the corporation filed a certificate of amendment with the Delaware Secretary of State. In

38

a decision addressing a motion to dismiss the complaint for failure to state a claim on which relief could be granted, then-Vice Chancellor, now Chief Justice Strine held that the complaint pled facts supporting the inference that "the [Certificate] Amendment and the Equity Incentive Plan resulted from a conscious scheme of entrenchment and personal self-enrichment by the [three top managers], facilitated by the advice of [the lawyer], which was purposely concealed from the [corporation's] stockholders when they were asked to vote on the Amendment and the Plan." *Sample v. Morgan (Sample I)*, 914 A.2d 647, 675 (Del. Ch. 2007).

After the dismissal ruling, the plaintiff sought to amend the complaint to add a claim for aiding and abetting breaches of fiduciary duty against the lawyer and his firm. They challenged the court's ability to exercise personal jurisdiction over them, resulting in a second decision from Chief Justice Strine. *See Sample II*, 935 A.2d at 1055. Like Sass, they argued that the filing of the certificate of amendment was the act of the corporation and could not be attributed to them for purposes of Section 3104(c)(1). Chief Justice Strine framed their contention as follows:

> In its broadest form, a form that the moving defendants did not shy from advancing, the moving defendants posit that the filing of a charter amendment or other key corporate instrument with the Secretary of State in Delaware may never form the basis for serving a party sued . . . in Delaware. Why? Because such documents are formally filed by the corporation itself and thus respect for the corporation's separate legal identity requires that the individuals who caused the corporation to make the filings cannot be held personally accountable for those filings for purposes of § 3104.

*Id.* at 1058-59.

Chief Justice Strine dismantled this argument:

39

One can sleep soundly at night confident that rejection of this argument is not at odds with either logic or sound public policy. When a claim for breach of fiduciary duty is at issue, the underlying conduct almost always involves formal action of the corporation itself. After all, the very essence of a breach of corporate law fiduciary duty claim is the misuse of corporate control. For example, an unfair squeeze out merger by a controlling stockholder quintessentially involves the corporation entering into a merger agreement . . . . That is, claims of fiduciary duty ultimately rest on the proposition that a corporate fiduciary has caused the corporation to do something at odds with its own best interests, typically so that the fiduciary could secure an improper personal benefit . . . .

Although there are sound public policy reasons for limiting the ability of contract and tort claimants to file certain claims against corporate officers and directors for conduct of the corporation itself, those reasons have little to do with this case or other cases involving the internal affairs of corporations. When well-pled facts support the inference that a person caused a corporation to take jurisdictionally-significant conduct in Delaware and that conduct is an element in a scheme by corporate fiduciaries to unfairly advantage themselves at the expense of a Delaware corporation and its stockholders, our case law has consistently held that the long-arm statute may be used to serve that person. It would be surprising were it otherwise, because a contrary ruling would turn the very essence of faithless conduct—the abuse of corporate power—into an immunity from accountability, precisely because the disloyal fiduciaries derived their wrongful gains from actions of the corporation itself, albeit corporate actions that their own conduct brought about. Such an accountability-destroying reading of the long-arm statute would itself be entirely disloyal to the statute's purpose, as articulated by our Supreme Court . . . .

*Id.* at 1059-60 (footnotes omitted).

The Chief Justice's reasoning in *Sample II* applies to Sass. The Complaint challenges Sass' alleged misuse of corporate power in causing Sterling to enter into a merger agreement that allowed Eastman to acquire the Company at an unfair price. The Complaint rests on the proposition that Sass caused Sterling to do something at odds with its own best interests and the best interests of its stockholders so that Sass could secure an improper personal benefit in the form of the liquidity that Resurgence desperately

needed. In contrast to a case involving contractual counterparties or third party tort claimants, there is no basis to interpose an entity veil in a matter involving the corporation's internal affairs. The well-pled facts of the Complaint support the inference that jurisdictionally significant conduct occurred in Delaware as part of a scheme by corporate fiduciaries to advantage themselves at the expense of a Delaware corporation and its stockholders. Under those circumstances, "our case law has consistently held that the long-arm statute may be used to serve that person." *Id.* at 1060.

As in the *Microsoft* and *Sample II* decisions, Sass is subject to personal jurisdiction in Delaware. His motion to dismiss is denied.

## B.    Jurisdiction Over The Sass Plan

The Sass Plan's motion to dismiss for lack of personal jurisdiction is also denied. The analysis of the *Istituto Bancario* elements is the same as for Sass, with the Sass Plan contesting only the second element, whether the Sass Plan "was a member of that conspiracy," and the fourth element, whether the Sass Plan "knew or had reason to know of the act in the forum state or that acts outside the forum state would have an effect in the forum state." 449 A.2d at 225.

As to the second element, the Sass Plan is properly considered a member of the conspiracy because Sass himself, a co-conspirator, controlled the Sass Plan. Sass signed a written consent on the Sass Plan's behalf as its trustee.

As to the fourth element, Sass' knowledge of the Sterling Transaction is fairly imputed to the Sass Plan. *See, e.g.*, *Triton Const. Co. v. E. Shore Elec. Servs., Inc.*, 2009 WL 1387115, at *16 (Del. Ch. May 18, 2009) (imputing knowledge of individual

41

controlling corporation to entity), *aff'd*, 988 A.2d 938 (Del. 2010); *Teachers' Ret. Sys. of La. v. Aidinoff*, 900 A.2d 654, 671 (Del. Ch. 2006) (same). The attribution of Sass' knowledge to the Sass Plan and Sass' use of the Sass Plan to effectuate the Sterling Transaction gives the Sass Plan a sufficient connection with Delaware to make it amenable to suit here.

### III.    CONCLUSION

This court can exercise personal jurisdiction over Sass and the Sass Plan for the purpose of the claims set forth in the Complaint. The Rule 12(b)(2) motions are denied.