**HERCULES INCORPORATED, a Delaware Corporation, Plaintiff Below, Appellant/Cross–Appellee,**

v.

**LEU TRUST AND BANKING (BAHAMAS) LIMITED, a Bahamian Corporation, and Bank Leu A.G., a Swiss Corporation, Defendants Below, Appellees/Cross–Appellants.**

Supreme Court of Delaware.

Submitted: May 27, 1992.
Decided: Aug. 20, 1992.

S. Maynard Turk, Thomas R. Hunt, Jr., Morris, Nichols, Arsht & Tunnell, Wilmington, Robert E. Crotty (argued), Alan R. Kusinitz, James P. McCabe, Kelley, Drye & Warren, New York City, of counsel, for appellant/cross-appellee.

Bruce M. Stargatt, Bruce L. Silverstein, Young, Conaway, Stargatt & Taylor, Wilmington, David M. Miles, Washington, D.C. (argued), Jonathan Shub, Joseph C. Port, Jr., Fried, Frank, Harris, Shriver & Jacobson, Washington, D.C., of counsel, for appellees/cross-appellants.

Before HORSEY, MOORE and HOLLAND, JJ.

MOORE, Justice.

Hercules Incorporated, a Delaware corporation having its headquarters and principal place of business in Wilmington, Delaware ("Hercules"), appeals the dismissal of its suit in the Superior Court against two defendants, Bank Leu, A.G., a Swiss banking corporation, and Bank Leu International ("BL International"), a Bahamian corporation wholly owned by Bank Leu, A.G.[1] Plaintiff charges the defendants with misappropriation of Hercules' inside information, constituting part of a much broader conspiracy to engage in such illegal activity. The trial court concluded that the Bank Leu defendants were properly served under Delaware's long arm statute, 10 Del.C. § 3104, but held that subjecting them to the jurisdiction of the Delaware courts did not comport with the due process requirements of *Instituto Bancario Italiano SpA v. Hunter Engineering Co., Inc.*, Del.Supr., 449 A.2d 210 (1982) (*Hunter Engineering*). The Superior Court made the necessary determination under Superior Court Civil Rule 54(b), and direct-

ed the entry of a final judgment on this issue. The Bank Leu defendants cross appeal from that ruling.

We conclude that the Superior Court failed to give full effect to the due process test of *Hunter Engineering*, thus construing it too narrowly. We therefore reverse the dismissal of this action as to the Bank Leu defendants. In all other respects the judgment of the Superior Court is affirmed.

### I.

### A.

This case was born of a conspiracy. The Bank Leu defendants are sophisticated international banking organizations. The issues evolve from an illicit banking relationship between Bank Leu and Dennis Levine ("Levine"), an investment banker who then was a vice-president of Shearson Lehman Brothers, Inc. ("Lehman Brothers").[2]

On May 27, 1980, Levine, using the cryptic name "Diamond," first met with representatives of Bank Leu in Nassau, Bahamas, to discuss the possibility of opening an account.[3] Later that same day, "Mr. Diamond" returned and opened a securities trading account with BL International. Although Levine used the alias "Diamond," Bank Leu knew Levine's real name and New York address, knew he was an investment banker in the United States, interested only in the market for United States securities, and was well aware that Levine was obsessed with security precautions to ensure confidentiality of his accounts and their related transactions. For example, Levine instructed BL International that he would place his orders via collect telephone calls and that he did not wish to receive any communications from Bank Leu, either written or oral. Indeed, even after Bank Leu's first meeting with Levine, it was

---

1. Unless the context otherwise requires, Bank Leu, A.G., and BL International will be referred to collectively as "Bank Leu" or the "Bank Leu defendants."

2. Lehman Brothers was formerly Lehman Brothers Kuhn Loeb.

3. Levine's former Swiss banker, Pictet & Cie, allegedly closed his account after discovering that Levine used it to engage in insider trading.

noted in a file memorandum prepared by a bank official that "we should pay attention at [sic] the way Mr. Diamond is operating. He certainly looks [like] a demanding customer."

Soon after Levine opened his account with BL International, it became obvious to Bank Leu that he was illegally trading on inside information. That, however, did not deter Bank Leu. Instead, it facilitated Levine's illegal activities by placing numerous trades for his account. Not only did Bank Leu profit handsomely from the commissions it earned from Levine's trades, it began profiting directly by parallelling Levine's trading activity. Specifically, Bank Leu and a number of its highest officials "piggy-backed" Levine's trades for their own accounts. Additionally, Bank Leu also "piggy-backed" Levine's trades for the benefit of its managed accounts on behalf of others, thus generating additional commissions.

The record shows that from 1980 through 1986, Bank Leu joined in Levine's misappropriation of inside information by profitably trading in the stock of at least fifty-four publicly traded companies. Before the matter arose, which is the subject of this lawsuit, Bank Leu had engaged in twenty-seven transactions, involving twenty-nine Delaware companies, by trading in their stocks for its own profit. All of these insider trades were the most significant securities trading at BL International during this period.

In order to continue receiving its illicit profits, Bank Leu deliberately concealed Levine's activities from U.S. regulators. In 1981, a Bank Leu official, in an internal bank memorandum to the vice-president in charge of Levine's trading account, warned that the Securities and Exchange Commission ("SEC") was "getting very tough" on insider trading and that the bank needed to be quite careful with regard to Levine's trading. Rather than discontinuing its relationship with Levine, as his previous banker had done, Bank Leu chose instead to obscure these illegal activities. Thus, Bank Leu began spreading Levine's trades among various brokerage houses, and stopped using a brokerage house affiliated with Bank Leu. The defendants facilitated Levine's actions in other ways. Bank Leu accepted Levine's collect calls by which he placed his illegal trades, held his mail for him in the Bahamas, did not contact him, opened the bank on weekends to allow Levine to withdraw cash, and even assisted Levine in establishing a Panamanian corporation, Diamond Holdings, S.A., through which he made his trades. Frankly put, Levine could not have perpetrated his elaborate scheme to defraud and misappropriate information from numerous corporations had it not been for the assistance and active support of Bank Leu.

These illegal activities by Levine and Bank Leu continued for years until the Summer of 1985 when the SEC began to focus on numerous suspicious trades made by Bank Leu. These involved the stock of twenty-seven different companies, and Bank Leu knew that all of them involved Levine. Rather than cooperate with the SEC investigation, Bank Leu alerted Levine and took further steps to protect him from the regulators. Levine and Bank Leu destroyed documents which could be used to connect Levine with the Diamond trading account, fabricated a story that the suspicious trades were based upon publicly available information and were made by a Bank Leu employee for its managed accounts. False records were created to support the cover-up. Bank Leu also established another foreign corporation to which it transferred all the assets of Levine's Panamanian corporation, thus further obscuring Levine's activities.

Finally, in early 1986, Bank Leu could no longer conceal its illicit conduct from U.S. regulators. In exchange for immunity from criminal or civil prosecution, Bank Leu and its officers confessed their misconduct and cooperated with the SEC. Thus, Bank Leu revealed Diamond's true identity. Bank Leu also disgorged $866,136.18 in illegally obtained profits. In May 1986, Levine pled guilty to four felony charges, disgorged approximately $12 million in illegal profits, and was sentenced to two years in Federal prison.

## B.

The issues arise from the Levine–Bank Leu conspiracy. In 1983, Hercules contemplated an acquisition of Simmonds Precision Products ("Simmonds"). Simmonds was for sale in a blind auction in which Hercules anticipated making a bid of $52.50 per share payable in Hercules' stock.[4] In connection with this potential transaction, Hercules retained the services of Levine. Hercules did not know that Levine had been illegally trading on inside information with Bank Leu's assistance. With the confidential knowledge that Hercules intended to purchase Simmonds, Levine, as he had done numerous times in the past, misappropriated this information and began purchasing Simmonds stock through his account with Bank Leu.

As Hercules' investment banker, Levine was poised to further enhance his illegal profits. To inflate the value of his Simmonds stock, Levine allegedly advised Hercules, falsely, there would be many bidders for Simmonds, thus requiring a higher bid if Hercules wished to acquire the company in the blind auction. Following Levine's advice, Hercules bid $60 per share for Simmonds. In fact, Hercules was the sole bidder and would have acquired the company at its originally intended bid of $52.50 per share. Thus, as a direct result of Levine's misconduct, Hercules allegedly paid $7.50 more per share than was necessary to acquire Simmonds.

Bank Leu was an active participant in furthering these illegal activities. In addition to placing the trades for approximately 20,000 shares of Simmonds' stock for Levine, Bank Leu and its officials, as they had done numerous times, copied Levine by purchasing Simmonds stock for their own accounts and for the bank's discretionary managed accounts.

Although Bank Leu may not have known the exact source of Levine's inside information regarding Simmonds, Hercules' involvement soon became obvious. On June 29, 1983, Hercules and Simmonds publicly announced the execution and details of a merger agreement. Bank Leu nonetheless continued to actively participate in its conspiracy with Levine. In July 1983, after announcement of the Hercules–Simmonds merger, Bank Leu sold all of the Simmonds stock it was holding on behalf of Levine, the bank's officers, and its managed accounts. Thus, Bank Leu's illegal activities did not abate once Hercules' participation in the Simmonds transaction became known. Notably, these activities were among those which Bank Leu initially tried to conceal from the SEC.

## C.

On October 16, 1986, Hercules sued Levine, Lehman Brothers, and Bank Leu. The complaint alleged a conspiracy to defraud Hercules, and sought over $40 million in damages, which included the amount Hercules allegedly overpaid for Simmonds. Bank Leu moved to dismiss the complaint for lack of personal jurisdiction, and the Superior Court permitted Hercules to conduct discovery on that issue. Thereafter, the Superior Court dismissed the action for lack of personal jurisdiction over the Bank Leu defendants. Although the court found that service of process on the Bank Leu defendants was proper under Delaware's long arm statute, the court concluded that its exercise of jurisdiction over these defendants did not comport with due process under *Hunter Engineering*. Over the defendants' objections, the trial court entered a final judgment pursuant to Superior Court Civil Rule 54(b) ("Rule 54(b)"). This appeal followed.

## II.

Delaware courts apply a two-step analysis in determining the issue of personal jurisdiction over a nonresident. *LaNuova D & B SpA v. Bowe Co., Inc.*, Del.Supr., 513 A.2d 764, 768 (1986). First, we must consider whether Delaware's long arm statute is applicable, recognizing that 10 *Del.C.* § 3104(c) is to be broadly construed to confer jurisdiction to the maximum extent possible under the Due Process Clause. *Id.* (citing *Speakman Co. v. Harper Buffing*

4. $52.50 a share represented a substantial premium over Simmonds market price.

*Mach. Co.*, 583 F.Supp. 273 (D.Del.1984); *Moore v. Little Giant Indus., Inc.*, 513 F.Supp. 1043, 1048 (D.Del.1981), *aff'd*, 681 F.2d 807 (3d Cir.1982)). Next, the court must determine whether subjecting the nonresident defendant to jurisdiction in Delaware violates the Due Process Clause of the Fourteenth Amendment. *Id.*

▬ The Superior Court's application of Delaware's long arm statute necessarily involves a question of statutory interpretation which we will review to determine "whether the Superior Court erred as a matter of law in formulating or applying legal principles." *Moses v. Bd. of Educ. of the New Castle County Vocational Technical Sch. Dist.*, Del.Supr., 602 A.2d 61, 63 (1991) (quoting *Delaware Alcoholic Beverage Wholesalers, Inc. v. Ayers*, Del.Supr., 504 A.2d 1077, 1081 (1986)). However, to the extent the trial court's application of the long arm statute rests on findings of fact, this Court will accept those findings as long as they are supported by the record and are the product of an orderly and logical deductive process. *See Levitt v. Bouvier*, Del.Supr., 287 A.2d 671, 673 (1972). The trial court's conclusion as to the due process issue is purely a legal determination which we will review *de novo*. *Chao v. State*, Del.Supr., 604 A.2d 1351, 1360 n. 7 (1992); *Gannett Co., Inc. v. State*, Del. Supr., 571 A.2d 735, 739 (1989).

### III.

▬ Turning to the first required consideration, the trial court concluded that Bank Leu defendants were properly served under Delaware's long arm statute, 10 *Del.C.* § 3104, which provides:

(c) As to a cause of action brought by any person arising from any of the acts enumerated in this section, a court may exercise personal jurisdiction over any nonresident, or his personal representative, who in person or through an agent:

\*   \*   \*   \*   \*   \*

(3) Causes tortious injury in the State by an act or omission in the State.

10 *Del.C.* § 3104(c)(3). The trial court found that Levine's acts of allegedly pro-

viding false advice to Hercules, a Delaware corporation with its principle place of business in Wilmington, Delaware, were acts in this State which, if proven, caused a tortious injury in Delaware and, thus, were within Section 3104(c)(3). Moreover, the trial court concluded that Levine was Bank Leu's agent for purposes of Section 3104(c)(3). Therefore, since Levine's acts could be attributed to Bank Leu, the Bank Leu defendants were properly served pursuant to the Delaware long arm statute.

We agree that the Bank Leu defendants are subject to service of process under Section 3104(c)(3). There is no dispute that the well pled allegations of Hercules' complaint state a cause of action for purposes of the long arm statute. Hercules contends that it suffered a loss of over $40 million in Delaware as a result of the actions of the Levine–Bank Leu conspiracy. It is equally clear that a critical step in furtherance of the conspiracy's goals, Levine's alleged acts of false advice to Hercules, occurred in Delaware.

▬ While Bank Leu did not actively participate in Levine's giving the alleged false advice, we agree with the trial court's finding that Levine's acts in Delaware are attributable to Bank Leu pursuant to the "through an agent" language of Section 3104(c). It is not an arcane concept that conspirators are considered agents for jurisdictional purposes.. Indeed, courts have defined "agent" broadly to include not only a non-resident defendant's formal agents but also a defendant's co-conspirators. *Chrysler Capital Corp. v. Century Power Corp.*, 778 F.Supp. 1260, 1266 (S.D.N.Y. 1991); *Lehigh Valley Indus., Inc. v. Birenbaum*, 389 F.Supp. 798, 806–07 (S.D.N.Y. 1975), *aff'd*, 527 F.2d 87 (2d Cir.1975). While the Superior Court explicitly made no finding as to the substantive law of conspiracy, it implicitly found that Hercules made a sufficient factual showing of a relationship between Levine and Bank Leu to satisfy the requirements of the long arm statute. That determination was correct as a matter of law. Moreover, the court's finding for jurisdictional purposes of an agency relationship between Levine and

the Bank Leu defendants was fully supported by the record and the product of sound legal reasoning under *Levitt v. Bouvier.*[5]

## IV.

We turn to the due process issue. The trial court applied the five-part test of *Instituto Bancario Italiano SpA v. Hunter Engineering Co.,* Del.Supr., 449 A.2d 210 (1982). Specifically, a non-resident conspirator is subject to the jurisdiction of the Delaware courts if the plaintiff can show that: (1) a conspiracy to defraud existed; (2) the defendant was a member of that conspiracy; (3) a substantial act or substantial effect in furtherance of the conspiracy occurred in the forum state; (4) the defendant knew or had reason to know of the act in the forum state or that acts outside the forum state would have an effect in the forum state; and (5) the act in, or effect on, the forum state was a direct and foreseeable result of the conduct in furtherance of the conspiracy. *Hunter Engineering,* 449 A.2d at 225.

The trial court ruled that Hercules had not satisfied the fourth element of *Hunter Engineering.* The court concluded that Bank Leu neither knew nor had reason to know of Levine's alleged acts of false advice—the acts upon which the court stated Hercules' "cause of action is based."

Application of *Hunter Engineering* clearly is appropriate here. However, when applying the test, the trial court erred in focusing too narrowly on Levine's alleged acts of false advice. When a court applies *Hunter Engineering,* it is not nec-

essarily limited in its analysis to those acts upon which service of process under Delaware's long arm statute is based. By focusing solely upon Levine's acts of false advice, the trial court erroneously concentrated on a single part of the conspiracy between Bank Leu and Levine.

### A.

Clearly, to the extent Bank Leu is subject to jurisdiction in Delaware, it is as a result of its key role and active participation in the Levine–Bank Leu conspiracy. Thus, any due process analysis necessarily requires an application of the conspiracy theory of jurisdiction.[6] That concept was first addressed by this Court in *Hunter Engineering, supra.* There, the Court noted that the Supreme Court of the United States had not definitively examined the conspiracy theory of jurisdiction. *Hunter Engineering,* 449 A.2d at 225. That situation remains unchanged today. Thus, we reaffirm the vitality of *Hunter Engineering,* recognizing that it was meant to be a "workable standard" which would "inevitably call for refinement." *Id.*

*Hunter Engineering* extensively reviews the various tests adopted by other courts in ruling upon the conspiracy theory of jurisdiction. *Id.* at 222–25. The Court rejected those cases which required only a minimal showing in order to confer jurisdiction upon the forum state,[7] concluding that such a minimalist approach was inconsistent with due process. Instead, the Court adopted a stricter standard which it believed comported with the due process principles of *International Shoe Co. v. State*

---

5. Because we find the trial court's ruling with respect to Section 3104(c)(3) to be correct, we need not address Hercules' alternative bases for service of process pursuant to the long arm statute.

6. Although termed a "theory" of jurisdiction, our use of the "conspiracy theory" merely provides a framework with which to analyze a foreign defendant's contacts with Delaware. We do not view the conspiracy as an independent jurisdictional basis, nor do we simply attribute the acts of one conspirator to another for purposes of the due process analysis. Applying the conspiracy theory of jurisdiction in these ways has been criticized as leading to

unconstitutional results. *See* Stuart M. Riback, Note, *The Long Arm and Multiple Defendants: The Conspiracy Theory of In Personam Jurisdiction,* 84 Colum.L.Rev. 506 (1984); Ann Althouse, *The Use of Conspiracy Theory to Establish In Personam Jurisdiction: A Due Process Analysis,* 52 Fordham L.Rev. 234 (1983).

7. *See, e.g., Maricopa County v. American Petrofina, Inc.,* 322 F.Supp. 467 (N.D.Cal.1971) (only showing required to satisfy due process is an allegation of the existence of a conspiracy in conjunction with an allegation of some act or event within the state).

*of Washington,* 326 U.S. 310, 66 S.Ct. 154, 90 L.Ed. 95 (1945), and its progeny.

### B.

### 1.

The trial court assumed that elements one through three of the *Hunter Engineering* test were satisfied. That is: (1) a conspiracy to defraud existed; (2) Bank Leu was a member of that conspiracy; and (3) a substantial act of substantial effect in furtherance of the conspiracy occurred in Delaware. Bank Leu does not seriously contest these findings, and we affirm them.[8] *Levitt v. Bouvier,* 287 A.2d at 673. The record clearly establishes that: 1) a conspiracy to defraud Hercules by misappropriating its confidential information, trading on such information, and concealing such illegal activity, existed; 2) the Bank Leu defendants were members of this conspiracy, and 3) both a substantial act and effect of this conspiracy occurred in Delaware.

### 2.

As for the fourth element of *Hunter Engineering,* even if Bank Leu did not have reason to know of Levine's specific acts of false advice, that does not end the analysis. The trial court's error was that it focused too narrowly on Levine's acts rather than viewing the conspiratorial activities of the defendants as a whole.

Thus, the Superior Court limited its analysis to those acts upon which service of process was based, *i.e.,* Levine's advising Hercules to bid $60 per share for Simmonds.[9] That test is too restrictive under *Hunter Engineering.* The existence of personal jurisdiction depends upon two independent considerations—the long arm statute and due process. *See LaNuova D & B, supra.* Satisfying the first part of this analysis simply means that the legislative requirements of service of process have been met. It does not mean that due process is satisfied, nor should it be confused with that concept. Step one is nothing more than an application of the language of the long arm statute while the second step involves issues of constitutional dimensions.

■ *Hunter Engineering* demands this conclusion. Thus, the Superior Court had to examine whether Bank Leu knew or had reason to know of Levine's act in Delaware or that acts outside of Delaware have an effect in this State. *Hunter Engineering,* 449 A.2d at 225. In contrast, however, the long arm statute permits service of process based upon acts occurring outside the State only if the defendant "regularly does or solicits business, engages in any other persistent course of conduct in the State or derives substantial revenue from services, or things used or consumed in the State." 10 *Del.C.* § 3104(c)(4). It is obvious, however, that *Hunter Engineering* contemplates some acts which may be considered for purposes of due process that are not necessarily those upon which service of process itself is based.[10]

Here, the record shows that at the time Bank Leu sold its Simmonds stock for Levine, its managed accounts, and for itself, it knew that Hercules was the acquiring

---

**8.** Because the existence of the conspiracy was largely conceded by Bank Leu, the trial court considered it unnecessary to affirmatively and explicitly set forth factual findings with respect to elements one through three of the *Hunter Engineering* test. While we do not criticize the Superior Court for making such "assumptions," as opposed to affirmative factual findings, it would have been preferable for the trial court to have made factual findings. However, for purposes of appellate review we treat such assumptions as established findings of fact by the trial judge.

**9.** The trial judge, in his bench ruling, stated: "I have to agree [with Bank Leu] that there was no

reason to know that Levine was advising Hercules or that he would take the additional step [of providing false advice]...."

**10.** 10 *Del.C.* § 3104(j) provides: "When jurisdiction over a person is based solely upon this section, only a cause of action arising from any act enumerated in this section may be asserted against him." While this section has not been addressed by the parties, and has never been interpreted by this Court, it simply protects a nonresident defendant from claims wholly unrelated to the acts upon which service of process is based. Thus, Section 3104(j) does not affect our due process conclusions here.

company. That conscious decision to sell, as Hercules aptly argued, consummated the theft of Hercules' inside information. Clearly, Bank Leu knew, or had reason to know, that such a misappropriation had an effect in Delaware by its impact on a Delaware company with its principal place of business in that State.

■ Based on the foregoing, we are satisfied that Hercules made a sufficient factual showing that Bank Leu had reason to know that acts outside Delaware would have an effect in Delaware. This meets the second half of element four of *Hunter Engineering*.[11] Bank Leu had reason to know that its conspiratorial actions which occurred outside Delaware (*i.e.*, the defendants' acts of misappropriation and concealment), would have an effect in Delaware.

■ Bank Leu claims that it did not have "reason to know" of the acts or effects in Delaware because there was no duty to ascertain unknown facts or to inquire into the true state of affairs. We reject that self-serving argument. It is a basic principle of law, indeed a matter of common sense, that a defendant has "reason to know" when he or she possesses information from which a person of reasonable intelligence *or of the superior intelligence of the actor* would infer that the fact in question exists, or that such person would govern his or her conduct upon the assumption that such fact exists. *See* Restatement (Second) of Torts § 12(1) (1965) (emphasis added). That is entirely consistent with *Hunter Engineering*.

Given the superior knowledge and sophistication of Bank Leu, it either possessed, or had available to it, sufficient information to infer that the actions of the conspiracy would affect Hercules in Delaware. Bank Leu knew Levine was actively involved in insider trading. It knew he was an investment banker interested only in the United States securities markets. It knew he was actively trading in Simmonds stock. It had excellent reason to know that Levine had inside information with respect to Sim-

monds. Significantly, after Hercules acquired Simmonds, and this became public, Bank Leu, nevertheless continued to profit from the conspiracy's illegal activities and, most importantly, actively concealed the conspiracy's existence, including the Levine–Bank Leu activities respecting the Hercules–Simmonds acquisition. It strains credulity for Bank Leu now to turn its head and shade its eyes from the obvious. Indeed, it offends common sense. Any other result would not only be inconsistent with, but would subvert, traditional notions of fair play and substantial justice. *See International Shoe*, 326 U.S. at 316, 66 S.Ct. at 158.

### 3.

■ Thus, under the fifth, and final, element of the *Hunter Engineering* test, given our analysis of element four, we conclude that the conspiracy's acts in, and effects on, Delaware were a direct foreseeable result of conduct in furtherance of the conspiracy's goals. Under all of the foregoing circumstances, Bank Leu so voluntarily participated in the Levine–Bank Leu conspiracy, that it has purposefully availed itself to the jurisdiction of Delaware's courts.

### V.

In their cross-appeal, the Bank Leu defendants claim that the Superior Court improvidently entered a final judgment in their favor under Superior Court Civil Rule 54(b), thus permitting an immediate appeal by Hercules. There is no merit to this claim.

Bank Leu seizes upon a single passing remark made by the trial judge in response to Hercules' counsel's request for the entry of a final judgment. The trial judge stated:

> My inclination generally is not to grant certification [sic], but where you are dismissing an action on jurisdictional

---

11. The trial court did not address the second part of element four since it focused exclusively on Levine's acts in Delaware when applying *Hunter Engineering*.

grounds, it seems to me that certification [sic] ought to be granted.[12]

██ The issue was fully briefed and considered by the trial court. The decision to enter a final judgment pursuant to Rule 54(b) is within the sound discretion of the trial court and will only be overturned if we find a clear abuse of that discretion. *Cf. Curtiss–Wright Corp. v. General Electric Co.*, 446 U.S. 1, 10, 100 S.Ct. 1460, 1466, 64 L.Ed.2d 1 (1980). The trial court's entry of a final judgment, thereby permitting an immediate appeal, was well within its discretion. There were no contrivances of the types we disapproved in *Stroud v. Milliken Enterprises, Inc.*, Del.Supr., 552 A.2d 476 (1989), and *In re Rinehardt*, Del.Supr., 575 A.2d 1079 (1990). If anything, our resolution of the basic issues fully demonstrates the significance of the trial judge's grant of a final judgment. Now this case will proceed with the Bank Leu defendants before the courts.

    \*    \*    \*    \*    \*    \*

The entry of a final judgment pursuant to Rule 54(b) is AFFIRMED, the judgment of the Superior Court, granting Bank Leu's Motion to Dismiss, is REVERSED, and the matter is REMANDED to the Superior Court for trial.

**12.** The parties and the trial court referred to the procedure under Superior Court Civil Rule 54(b) as a "certification." This is both erroneous and confusing. Rule 54(b), which is virtually identical to the same numbered federal rule of civil procedure, provides for the entry of judgment upon one or more but fewer than all of the claims or parties only upon an "express *determination* that there is no just reason for delay and upon an express *direction* for the entry of judgment." (Emphasis added). The only "certification" procedure is under Supreme Court Rule 41, relating to interlocutory appeals to us on certain questions of law. No such interlocutory issues are presented here. This is a valid final judgment not involving any aspects of "certification" as that term is more properly used and understood in our courts.