# IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

ZYNC, INC.,

    Plaintiff,

    v.

PORSCHE INVESTMENTS
MANAGEMENT, S.A., PORSCHE
DIGITAL, INC., CHRISTIAN
KNÖRLE, and ULRICH THIEM,

    Defendants.

C.A. No. 2025-0284-JTL

## OPINION ADDRESSING RULE 12(B)(2) MOTION

Date Submitted: February 11, 2026
Date Decided: May 26, 2026

Christopher H. Lyons, Jason M. Avellino, ROBBINS GELLER RUDMAN & DOWD LLP, Wilmington, Delaware; Randall J. Baron, Michaela Park, ROBBINS GELLER RUDMAN & DOWD LLP, San Diego, California; *Attorneys for Plaintiff.*

Thomas W. Briggs, Jr., Sara Carnahan, MORRIS, NICHOLS, ARSHT & TUNNELL LLP, Wilmington, Delaware; Charles A. DeVore, Carrie M. Stickel, KATTEN MUNCHIN ROSENMAN LLP, Chicago, Illinois; Zoe Lo, KATTEN MUNCHIN ROSENMAN LLP, New York, New York; *Attorneys for Defendants Porsche Investments Management, S.A., Porsche Digital, Inc., Christian Knörle, and Ulrich Thiem.*

**LASTER, V.C.**

During the Cold War, the Strategic Air Command kept bombers armed with nuclear warheads in the air around the clock off the East Coast. On January 23, 1961, a bomber spiraled out of control mid-flight. The plane carried two hydrogen bombs, each 250 times more powerful than the bomb dropped on Hiroshima. Both were accidentally released over Goldsboro, North Carolina. Both started their firing sequences. One lodged deep in a muddy field, stopping the detonation process. The other only failed to detonate because a single safety switch malfunctioned.

The historical record thus demonstrates that an omission thankfully took place in North Carolina—the omission of a catastrophic thermonuclear event. That omission had a pronounced effect within the state: Rather than suffering a cataclysm, the state enjoyed an ordinary day.

In this case, Zync, Inc. (the "Company") relies on an omission to assert personal jurisdiction over a nonresident defendant. The Company was a startup in the automotive industry. Needing capital, it secured an investment from a subsidiary of Porsche AG. In the resulting transaction, Porsche gained the right to appoint a member of the Company's board of directors (the "Porsche Director"). Under a governance agreement, the Company agreed not to take specified actions without the affirmative vote of the Porsche Director.

When the Company later needed more capital, the Company's CEO negotiated a term sheet for a preferred stock financing led by a venture capital firm (the "VC Financing"). The VC Financing could not move forward without the Porsche Director's approval. The Porsche Director, however, refused to give his approval

without instructions from Ulrich Thiem, his superior at Porsche. Thiem never signed off, and the Porsche Director never gave his approval. The VC Financing fell through.

With the Company's need for capital becoming more acute, the Company's CEO negotiated a term sheet for an investment by a private equity firm (the "PE Financing"). The PE Financing could not move forward without the Porsche Director's approval, and he refused to give it without instructions from Thiem. Thiem never signed off, and the Porsche Director never gave his approval. The PE Financing fell through.

Unable to fund its operations, the Company shut down. In this action, the Company has sued the Porsche Director, the two Porsche affiliates responsible for the investment, and Thiem. The Company contends that Thiem aided and abetted the Porsche Director's breaches of fiduciary duty and tortiously interfered with the VC Financing and the PE Financing.

Thiem has moved for dismissal, asserting that the court cannot exercise jurisdiction over him. In response, the Company invokes the conspiracy theory of jurisdiction. That theory combines the statutory and constitutional requirements for personal jurisdiction under Delaware's Long-Arm Statute[1] into a single, five-element rubric. Two elements address the statutory dimension. Two elements address the constitutional dimension. One element relates to both.

---

[1] 10 *Del. C.* § 3104.

The Long-Arm Statute authorizes the exercise of personal jurisdiction over a nonresident "who in person or through an agent . . . [c]auses tortious injury in the State by an act or omission in this State."[2]

After failing to point to an act that allegedly caused injury in Delaware, the Company turned to the concept of an omission. According to the Company, but for the defendants' actions, the VC Financing or the PE Financing would have closed. Each would have required a filing with the Delaware Secretary of State, such as a certificate of designation for preferred stock. That filing would have constituted a Delaware act sufficient to support personal jurisdiction over an aider-and-abettor like Thiem. But because the defendants blocked both financings, the Delaware act never occurred.

A thermonuclear explosion and a filing with the Secretary of State have dramatically different effects, but both are discernable. Likewise, the omission of a thermonuclear explosion and the omission of a Secretary of State filing are dramatically different in their relative significance, but both have discernable effects measurable by the absence of what otherwise would have occurred. The Company maintains that the defendants' actions in preventing a filing with the Secretary of State resulted in an omission in Delaware sufficient to subject Thiem to jurisdiction here.

---

[2] *Id.* § 3104(c)(3).

That type of loosely associated omission is not enough. To support personal jurisdiction, the omission must either be part of the cause of action or have a sufficiently close nexus to the tortious injury. The omitted filing with the Delaware Secretary of State clears neither hurdle.

The court cannot exercise personal jurisdiction over Thiem. His motion for dismissal is granted.

## I.    FACTUAL BACKGROUND

The facts are drawn from the complaint, the documents it incorporates by reference, and the materials submitted by the parties in connection with their motions.[3] At this procedural stage, the court must credit the complaint's well-pled allegations and draw all reasonable inferences in the plaintiff's favor.

### A.    The Company And The Porsche Note.

Before its demise, the Company offered a cloud-based platform that provided video streaming, on-demand content, and other experiences for in-vehicle entertainment. Rana Sobhany founded the Company in 2020 and served both as its CEO and as a member of its board of directors (the "Board").

The Company sought a strategic partnership that would provide capital and a path to commercialization. The Company's technology attracted attention from Porsche AG, Mercedes-Benz AG, BMW, and other luxury manufacturers.

---

[3] Citations in the form "Compl. ¶ ___" refer to paragraphs of the amended complaint, which is the operative pleading. Dkt. 14. Citations in the form "OB Ex. ___ at ___" refer to exhibits defendants filed in support of their motion. Dkt. 20.

4

Porsche has an investment arm that backs promising technology startups. The entities in the investment arm include Porsche Investments S.A. ("Porsche Investments") and Porsche Digital, Inc. ("Porsche Digital").[4] Porsche Investments manages all of Porsche's investments in startups and venture capital funds. Porsche Digital identifies strategic investments for Porsche Investments. Distinguishing among the Porsche entities is not important for purposes of this decision, so unless specificity is warranted, this decision refers to Porsche.

Porsche saw promise in the Company and invested $2.9 million through a convertible note (the "Porsche Note").[5] Porsche also received 305,430 shares of common stock, representing 5% of the Company's equity on a fully-diluted basis.

The parties entered into a voting rights agreement (the "Voting Agreement") under which the Company committed to maintain a three-member board. The Voting Agreement granted Porsche the right to designate the Porsche Director.[6] Porche's rights under the Voting Agreement would persist as long as Porsche Investments held at least 2% of the Company common stock.[7]

---

[4] Porsche Investments was known as Porsche Investments GmbH before reincorporated in Luxembourg in 2023.

[5] The complaint alleges that the Porsche Note carried customary conversion rights, protections, and preferences. Compl. ¶¶ 24–27.

[6] *See* OB Ex. 2 ("VA") § 1.2.

[7] *See id.* § 1.2(a).

The parties also entered into an investor rights agreement (the "Investor Agreement") under which the Company could not take specified actions without the approval of the Porsche Director. Those actions included effectuating or consenting to a merger, consolidation, or similar substantial transaction or asset sale; creating or issuing any convertible security; purchasing, redeeming, or declaring dividends; or creating or issuing any debt security.[8] The agreement also gave Porsche Investments a right of first offer on any issuance of new securities.[9]

Porsche designated Christian Knörle as the Porsche Director. Knörle served as the Head of Company Building at Forward31, a business unit within Porsche Digital. In that role, he reported to Thiem, a Managing Director with Porsche Investments. Knörle, Sobhany, and Jizong Bruce Chan comprised the Board.

## B. Porsche Fails To Make Timely Payments On The Note.

The Porsche Note contemplated five payments to the Company, each at a specified time. The first two were due in September 2020. The third payment was due in November 2020. The final two were tied to commercialization goals and targeted for March and September 2021. Porsche began delaying payments in November 2020. The Company was a startup with limited cash, and the delays jeopardized the Company's stability.

---

[8] *See* OB Ex. 3 ("IA") § 5.4.

[9] *See id.* § 4.1.

6

After two delayed payments, Sobhany contacted e&Co. AG (the "Bridge Lender") about a short-term loan in June 2021. With the Board's unanimous approval, the Company borrowed €350,000 from the Bridge Lender in August of that year (the "Bridge Loan"). Sobhany guaranteed the Bridge Loan personally.

## C. Porsche Exercises Its Governance Rights.

The Company saw the Porsche Loan as the initial step in a long-term business relationship. In October 2021, the Company pitched its product to Porsche and received positive feedback. Two months later, however, Porsche declined to move forward, telling the Company that Porsche had "decided to go with another kind of concept."[10]

Although Porsche declined to proceed with the Company's technology, other major automakers expressed interest. By late 2021, the Company was negotiating significant contracts. But the prospect of securing those contracts made the Company's capital needs more pressing. Without capital, the Company could not scale its business to meet demand. With Porsche's ardor having cooled, the Company sought alternative sources of financing.

### 1. The VC Financing

In November 2021, a venture capital fund proposed to lead the VC Financing, consisting of a Series A round of $8 million at a pre-money valuation of $32 million. The Company and the fund executed a term sheet dated December 2, 2021. After

---

[10] Compl. ¶ 35.

greater-than-expected investor interest, the fund expanded the round to $10 million at a pre-money valuation of $40 million.

The VC Financing involved issuing Company securities, which required the Porsche Director's approval under the Investor Agreement. Sobhany called Knörle, who told Sobhany that could not formally approve the deal without permission from Thiem and Porsche Investments.

Over the next two months, Knörle met with Thiem several times seeking instructions on the VC Financing. Meanwhile, the Bridge Lender began pressing the Company for repayment. Sobhany emphasized the urgency of the situation, but Knörle would not act without approval from Thiem and Porsche Investments.

In April 2022, Knörle finally agreed to hold a vote on the VC Financing. Originally scheduled for April 11, Knörle delayed the meeting until April 12 so he could obtain instructions from Thiem's department. When the Board meeting convened, Knörle stated that if Sobhany formally called for a vote, he would vote against the VC Financing, killing the deal.

### 2. The Potential For Partner Financing

While Porsche stalled on the VC Financing, two commercial partners provided potential alternatives. In early March 2022, an American automaker expressed interest in an investment. Later that month, a German automaker also expressed interest.

At this same time, the Company had made serious progress toward commercial agreements with other automakers. After a successful pilot program in March, BMW proposed a deployment. In April, the Company began finalizing terms with Mercedes.

Sobhany shared news of those developments with the Board. On April 19, 2022, she reported that the Mercedes deal could be signed and announced by May 15.[11] On May 7, she reported that the Company had received a draft contract from Mercedes and a separate term sheet from the American automaker. The following week, Sobhany reported that the Mercedes contract was ready to sign. The agreement was formally executed on June 3, 2022, and announced publicly on June 21. The agreement contemplated a per-vehicle licensing fee that the Company projected could produce $40 million in revenue through 2028.

### 3. Porsche Investments Proposes A Bridge Loan.

Shortly after blocking the VC Financing, Knörle suggested that Porsche could offer the Company a bridge loan of $750,000. But on April 26, 2022, after speaking with Thiem, Knörle lowered the amount to "10% of [Porsche's] prior funding"—i.e., $290,000—that would be provided when the Company signed its first commercial agreement.[12] Sobhany told Knörle that the amount was too small to solve the Company's liquidity problems.

During the discussions about the bridge loan, Knörle pressed Sobhany for a copy of the draft contract with Mercedes, indicating he would send it to Thiem to

---

[11] *Id.* ¶ 48.

[12] *Id.* ¶ 49.

"kickstart the process" for the bridge financing.[13] Sobhany shared a draft on May 9, underscoring that it was highly confidential. She shared another draft on May 19.[14]

On June 7, 2022, Sobhany told Knörle that the Company had signed the contract with Mercedes and returned a revised term sheet to the American automaker. Sobhany re-emphasized the need for the bridge loan from Porsche.[15] Knörle told Sobhany to send him the competitors' internal data and a copy of the final Mercedes agreement, and then the money would follow.[16]

Sobhany complied, but Porsche stalled on the loan. Knörle reported that an internal meeting to discuss the loan had been postponed and that Porsche wanted to partner with the venture arm of the American automaker on the funding.[17]

On June 24, 2022, Porsche reneged by adding new conditions to its loan offer. Porsche demanded a personal guarantee from Sobhany and an additional Board seat. Sobhany refused.

### 4.    The PE Financing

In late June 2022, shortly after the Mercedes announcement, a private equity firm offered to acquire the Company for $50 million. Sobhany contacted Knörle, who

---

[13] *Id.* ¶¶ 50–51.

[14] *Id.*

[15] *Id.* ¶ 53.

[16] *Id.*

[17] *Id.* ¶ 54.

refused to provide any feedback on the PE Financing until there was a signed term sheet so he could seek approval from Thiem.[18]

Sobhany asked the fund to consider a $4 million loan followed by a $15 million equity investment at a $60 million pre-money valuation. Of the initial loan amount, $3.335 million would be used to buy out Porsche at a premium. The fund expressed willingness to invest $15 million if coupled with a path to a whole company acquisition.

Sobhany again sought Knörle's input. Knörle again declined to weigh in, stating that he needed to discuss the idea with Thiem. He told Sobhany that he would not approve the PE Financing without instructions from Thiem, but that an internal Porsche committee would consider the proposal on August 26, 2022. At the last minute, the committee meeting was postponed.

On August 29, 2022, the Company and the fund executed a term sheet for the PE Financing. Sobhany and Chan approved the deal. Knörle refused to act without instructions from Thiem.

By mid-September 2022, Knörle still had not acted. Thiem and his team said they would block the deal unless they could speak directly to the fund. In mid-October, Porsche told the fund that Knörle would only be authorized to approve the transaction if the fund indemnified Knörle and Porsche for any damages. The fund refused, and the PE Financing fell through.

---

[18] *Id.* ¶¶ 59–60.

**D.    The Company Shuts Down.**

The Bridge Loan came due in August 2022, and in September the Bridge Lender sued the Company and Sobhany for the amounts due. A default judgment was ultimately entered against the Company for approximately €244,500.

After the Bridge Lender sued, Porsche instructed Knörle to cut ties with the Company. Knörle resigned effective October 31, 2022.

With Porsche no longer an obstacle, Sobhany tried to revive the PE Financing. The fund declined to proceed, citing the "overhang of Porsche's lack of cooperation and its outstanding contractual rights[.]"[19] Other potential investors declined to invest, citing Porsche's governance rights. Without the ability to raise capital, the Company shut down.

Sobhany has since learned that the Company's experience was not unique. She believes that Porsche employs a "catch and kill"[20] investment strategy that involves making a seed investment in a startup in return for governance rights, then using the governance rights to block other sources of capital. By making the startup

---

[19] *Id.* ¶ 71.

[20] In journalism, the term "catch and kill" refers to the practice of buying an exclusive story for the explicit purpose of not publishing it. *See, e.g.*, Ronan Farrow, Catch and Kill (2019) (describing the widespread use of this practice to prevent publication of stories about Harvey Weinstein). In the corporate context, a similar phenomenon has been termed the "killer acquisition," where a firm acquires an innovative target to terminate the target's growth and preempt competition. *See generally* Colleen Cunningham, Florian Ederer, & Song Ma, *Killer Acquisitions*, 129 J. Pol. Econ. 649 (2021) (coining the term and presenting empirical data supporting the phenomenon in the pharmaceutical industry).

dependent on Porsche, Porsche gains control of the startup's new and potentially disruptive technology. If Porsche wants to deploy the technology, it can. If not, Porsche can force the startup to shut down, while maintaining control over its intellectual property. The complaint cites exchanges between Sobhany and other founders or executives that support this theory. Knörle acknowledged the pattern.[21]

## E.     This Litigation

In March 2025, the Company filed suit. The operative complaint contains four counts.

Count I asserts that Knörle breached his fiduciary duties by acting to harm the Company and for the benefit of Porsche.

Count II asserts that Thiem, Porsche Investments, and Porsche Digital aided and abetted Knörle's breaches of fiduciary duty.

Count III claims that Thiem, Porsche Investments, and Porsche Digital tortiously interfered with the VC Financing and PE Financing.

Count IV claims that Porsche Investments' use of the Porsche Director's approval rights to block transactions violated the implied covenant of good faith and fair dealing in the Investor Agreement.

The defendants moved to dismiss the operative complaint for failing to state a claim on which relief can be granted. Thiem moved for dismissal, contending that the

---

[21] *Id.* ¶¶ 73–75.

court cannot exercise personal jurisdiction over him. This decision addresses Thiem's motion.

## II.  LEGAL ANALYSIS

A motion under Rule 12(b)(2) challenges the court's ability to exercise personal jurisdiction over a party. Because personal jurisdiction presents a threshold issue, a trial court should typically address it before turning to a Rule 12(b)(6) motion.[22]

"Generally, a plaintiff does not have the burden to plead in its complaint facts establishing a court's personal jurisdiction over [a] defendant."[23] However, "[w]hen a defendant moves to dismiss a complaint pursuant to Court of Chancery Rule 12(b)(2), the plaintiff bears the burden of showing a basis for the court's exercise of jurisdiction over the defendant."[24] This "burden . . . is an evidentiary burden, not a pleading burden."[25] The plaintiff "need only make a *prima facie* showing" sufficient to support jurisdiction, with the record construed "in the light most favorable to the plaintiff."[26]

---

[22] *Werner v. Miller Tech. Mgmt., L.P.*, 831 A.2d 318, 327 (Del. Ch. 2003) ("Before reaching the merits of defendants' motion to dismiss under Court of Chancery Rule 12(b)(6), the court must first consider the defendants' motion to dismiss for lack of personal jurisdiction pursuant to Court of Chancery Rule 12(b)(2).").

[23] *Harris v. Harris*, 289 A.3d 277, 295 (Del. Ch. 2023) (citing *Benerofe v. Cha*, 1996 WL 535405, at *3 (Del. Ch. Sept. 12, 1996)).

[24] *Ryan v. Gifford*, 935 A.2d 258, 265 (Del. Ch. 2007).

[25] *Harris*, 289 A.3d at 326 (Del. Ch. 2023) (citing *Hart Hldg. Co. Inc. v. Drexel Burnham Lambert Inc.*, 593 A.2d 535, 538 (Del. Ch. 1991) (Allen, C.)).

[26] *Sprint Nextel Corp. v. iPCS, Inc.*, 2008 WL 2737409, at *5 (Del. Ch. July 14, 2008); *accord Sample v. Morgan,* 935 A.2d 1045, 1056 (Del. Ch. 2007) ("In evaluating

14

The exercise of personal jurisdiction under Delaware law involves a two-step inquiry.[27] First, the court must determine whether a statute, like the Long-Arm Statute, supplies a valid method for serving and asserting jurisdiction over the nonresident defendant.[28] If so, then the court must ensure the assertion of personal jurisdiction comports with the Due Process Clause of the United States Constitution.[29] To satisfy that second step, the nonresident defendant must have "sufficient minimum contacts with [the forum state] such that the maintenance of the suit does not offend traditional notions of fair play and substantial justice."[30]

The Company grounds the exercise of jurisdiction over Thiem on the conspiracy theory of jurisdiction. To support this theory, the Company points to several Delaware-directed acts. Alternatively the Company argues that the Long-Arm Statute provides that an "omission" can support jurisdiction if the omitted action

---

the record [on a Rule 12(b)(2) motion], I must draw reasonable inferences in favor of the plaintiff."); *see also Ryan*, 935 A.2d at 265 ("If, as here, no evidentiary hearing has been held, plaintiffs need only make a prima facie showing of personal jurisdiction and the record is construed in the light most favorable to the plaintiff." (footnotes and internal quotation marks omitted)).

[27] *Matthew v. Fläkt Woods Grp. SA*, 56 A.3d 1023, 1027 (Del. 2012).

[28] *Id.*

[29] *Id.*

[30] *Id.* (alteration in original) (quoting *Int'l Shoe Co. v. Washington*, 326 U.S. 310, 316 (1945)); *see generally* 1 Donald J. Wolfe, Jr. & Michael A. Pittenger, *Corporate and Commercial Practice in the Delaware Court of Chancery* § 3.02 (2d ed. 2025).

would have had an effect in Delaware.[31] The Company argues that if the defendants had not blocked the VC Financing or the PE Financing, then a filing with the Secretary of State would have occurred. Because the defendants blocked those deals, the filing did not happen. The Company says that is an omission that should support jurisdiction to the same degree as a filing.

## A. The Test For Conspiracy Jurisdiction

Under the conspiracy theory of jurisdiction,

> a conspirator who is absent from the forum state is subject to the jurisdiction of the court, assuming he is properly served under state law, if the plaintiff can make a factual showing that: (1) a conspiracy to defraud existed; (2) the defendant was a member of that conspiracy; (3) a substantial act or substantial effect in furtherance of the conspiracy occurred in the forum state; (4) the defendant knew or had reason to know of the act in the forum state or that acts outside the forum state would have an effect in the forum state; and (5) the act in, or effect on, the forum state was a direct and foreseeable result of the conduct in furtherance of the conspiracy.[32]

The theory rests "on the legal principle that one conspirator's acts are attributable to the other conspirators."[33] Thus, "if the purposeful act or acts of one conspirator are of a nature and quality that would subject the actor to the jurisdiction of the court, all of the conspirators are subject to the jurisdiction of the court."[34]

---

[31] *See* 8 *Del. C.* § 3104(c)(3).

[32] *Istituto Bancario Italiano SpA v. Hunter Eng'g Co., Inc.*, 449 A.2d 210, 225 (Del. 1982).

[33] *Fläkt Woods*, 56 A.3d at 1027.

[34] *Istituto Bancario*, 449 A.2d at 222.

By satisfying the requirements for the conspiracy theory of jurisdiction, a plaintiff satisfies both elements of the two-prong jurisdictional test. The first three elements satisfy the requirements for serving process under the Long-Arm Statute. That statute states:

> As to a cause of action brought by any person arising from any of the acts enumerated in this section, a court may exercise personal jurisdiction over any nonresident, or a personal representative, who in person or through an agent:
>
> (1) Transacts any business or performs any character of work or service in the State . . . or
>
> (3) Causes tortious injury in the State by an act or omission in this State . . . .[35]

A single act or omission is sufficient to confer jurisdiction where the claim is based on that act or omission.[36] Forum-directed activity can be accomplished "through an agent."[37]

The first three elements track the statutory requirements of the Long-Arm Statute. Meeting the third element—showing that a "substantial act or substantial effect in furtherance of the conspiracy occurred in the forum state"[38]—satisfies the

---

[35] 10 *Del. C.* § 3104(c).

[36] *See Crescent/Mach I P'rs, L.P. v. Turner*, 846 A.2d 963, 978 (Del. Ch. 2000) ("[A] single transaction is sufficient to confer jurisdiction where the claim is based on that transaction." (internal quotation marks omitted)); *accord LaNuova D & B, S.p.A. v. Bowe Co., Inc.*, 513 A.2d 764, 768 (Del. 1986).

[37] *Id.* § 3104(c).

[38] *Istituto Bancario*, 449 A.2d at 225.

17

Long-Arm Statute's requirement that the defendant transact business, perform work, or take an action that occurs or would have an effect in Delaware. Meeting the first and second elements—the existence of a conspiracy and the defendant's membership in it—imputes the jurisdiction-conferring act to the defendant under agency principles.[39] The conspiracy theory thus may not be an independent basis for establishing personal jurisdiction, but meeting the first, second, and third elements satisfies the Long-Arm Statute's requirements.

The third, fourth, and fifth elements address the constitutional dimension. The third element requires more than just any act or effect in Delaware; it demands "a substantial act or substantial effect in furtherance of the conspiracy."[40] That requirement speaks to the sufficiency of the forum-directed contacts. The fourth and fifth elements—whether the defendant "knew or had reason to know of" the forum-directed activity and the degree to which the forum-directed activity was "a direct and foreseeable result of the conduct in furtherance of the conspiracy"[41]—address whether the defendant could reasonably anticipate being sued in Delaware.[42] "[A] defendant who has so voluntarily participated in a conspiracy with knowledge of its

---

[39] *Hercules Inc. v. Leu Tr. & Banking (Bahamas) Ltd.*, 611 A.2d 476, 481 (Del. 1992) ("[C]onspirators are considered agents for jurisdictional purposes."); *accord Carlton Invs. v. TLC Beatrice Int'l Hldgs., Inc.*, 1995 WL 694397, at *12 (Del. Ch. Nov. 21, 1995) (Allen, C.).

[40] *Istituto Bancario*, 449 A.2d at 225.

[41] *Id.*

[42] *See Carlton Invs.*, 1995 WL 694397, at *12.

18

acts in or effects in the forum state can be said to have purposefully availed himself of the privilege of conducting activities in the forum state, thereby fairly invoking the benefits and burdens of its laws."[43] Where the third, fourth, and fifth elements are satisfied, a defendant has sufficient minimum contacts with Delaware to satisfy due process.

## B.    The Absence Of Any Delaware-Directed Act

The Company argues that Thiem subjected himself to jurisdiction in Delaware by aiding and abetting Knörle's breaches of fiduciary duty. But a properly pled claim for aiding and abetting only means that Knörle's acts can be attributed to Thiem for jurisdictional purposes. There still must be a Delaware-directed act.

The Company argues that Thiem signed the Porsche Note, the Investor Agreement, and the Voting Agreement, then observes that each agreement opts for Delaware law. The Company concludes that Thiem's act of signing those agreements was a jurisdiction-supporting act. That is not so.

A Delaware choice-of-law provision is not a Delaware-directed act.[44] By statute, signing an agreement that selects Delaware law can establish "a significant,

---

[43] *Istituto Bancario*, 449 A.2d at 225; *accord Hercules*, 611 A.2d at 482 n.6 (explaining that the conspiracy theory "provides a framework with which to analyze a foreign defendant's contacts with Delaware").

[44] *EBP Lifestyle Brands Hldgs., Inc. v. Boulbain*, 2017 WL 3328363, at \*7 (Del. Ch. Aug. 4, 2017) (describing a Delaware choice-of-law clause as a "far cry from the kind of 'minimum contacts' that would satisfy due process."); *see also Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 478 (1985) (holding that "an individual's contract with an out-of-state party alone" cannot "automatically establish sufficient minimum contacts in the other party's home forum[.]").

19

material and reasonable relationship with this State," but the parties must be "[s]ubject to the jurisdiction of the courts of, or arbitration in, Delaware" and subject to the service of legal process.[45] The Porsche Note, the Investor Agreement, and the Voting Agreement do not meet those requirements. Moreover, they bound Porsche, not Thiem. The Company does not allege that Thiem signed the agreements in Delaware, sent them to Delaware, negotiated any aspect of them in Delaware, or engaged in any Delaware-related conduct.[46]

The Company also argues that (1) the act of appointing a director to the board of a Delaware corporation is a Delaware-directed act and (2) Thiem subjected himself to jurisdiction in Delaware by exercising Porsche's right and appointing Knörle as the Porsche Director. Neither is sufficient. No Delaware case has treated the appointment of a director, standing alone, as a Delaware-directed act.[47] Here too,

---

[45] 6 *Del. C.* § 2708(a).

[46] *See Harstel v. Vanguard Gp., Inc.*, 2011 WL 2421003, at *11 (Del. Ch. June 15, 2011) ("[A] business relationship between an out-of-state defendant's employer and a company located in Delaware does not provide the necessary contacts to satisfy the Delaware long-arm statute as to the defendant-employee."), *aff'd*, 38 A.3d 1254 (Del. 2012).

[47] *Cf. RJ Assoc., Inc. v. Health Payors' Org. Ltd. P'ship*, 1999 WL 550350, at *5–6 (Del. Ch. July 16, 1999) (finding that defendant transacted business in Delaware sufficient to support personal jurisdiction where the defendant participated in the formation of the Delaware limited partnership at issue and exercised control over the general partner). By analogy, Section 18-109(a)(ii) of the Delaware Limited Liability Company Act authorizes the assertion of jurisdiction over persons who participate substantially in the LLC's business and thereby become de facto managers. *See* 6 *Del. C.* § 18-109(a)(ii); *In re P3 Health Gp. Hldgs., LLC*, 285 A.3d 143, 157 (Del. Ch. 2022). But Section 109(a) provides that "the power to elect or otherwise select or to participate in the election or selection of a person to be a 'manager' as defined in § 18-

---

20

Thiem exercised Porsche's director appointment right, so at most his act could subject Porsche to jurisdiction.

The Company has therefore failed to identify a Delaware-directed act that could support jurisdiction under the conspiracy theory. None of the key decisions happened in Delaware. Nor were there any filings with the Delaware Secretary of State, an event that often provides the requisite Delaware nexus.[48]

## C.    The Concept Of A Delaware-Directed Omission

Lacking any Delaware-directed act, the Company pivots to the idea of a Delaware-directed omission. Section 3104(c) authorizes specific jurisdiction over a person who "[c]auses tortious injury in the State by an act or omission in this State."[49]

The Company argues that the jurisdiction-conferring omission was the absence of the filing with the Delaware Secretary of State that inferably would have taken place if either the VC Financing or the PE Financing had closed. To move forward with either transaction and raise the capital that was contemplated, the Company would have filed a certificate of designation or other corporate filing, like a certificate

---

101 of this title shall not, by itself, constitute participation in the management of the limited liability company." 6 *Del. C.* § 18-109(a)(ii). Carried over into the corporate context, the power to elect, otherwise select, or participate in the election or succession of a director of a Delaware corporation would not, by itself, establish personal jurisdiction over the power holder.

[48] *See Perry v. Neupert*, 2019 WL 719000, at *34 (Del. Ch. Feb. 15, 2019) (holding that "[f]iling a corporate instrument in Delaware to facilitate the challenged transaction satisfies [the third] element" of conspiracy jurisdiction).

[49] 10 *Del. C.* § 3104(c)(3).

of amendment or a certificate of merger. At that point, a jurisdiction-conferring Delaware act would exist.[50] The Company argues that by blocking the VC Financing and the PE Financing, the defendants (including Thiem) caused an omission—the absence of that Delaware filing. That omission, the Company says, had an effect in Delaware, just as the omission of a nuclear catastrophe in Goldsboro had an effect in North Carolina.

That argument gets top marks for creativity, but it misreads the role of an omission under the Long-Arm Statute. The operative section requires an omission in Delaware that causes tortious injury in Delaware. The statute requires more than simply an omission in Delaware compared to what would have happened along an alternative timeline. The statute requires an omission that causes tortious injury.[51]

Precedent shows that an omission giving rise to jurisdiction in a state generally involves a party present in the state who failed to act when under a duty to act,

---

[50] *See, e.g.*, *P3 Health Gp.*, 285 A.3d at 151 n.2 (explaining that "the filing of the certificate of merger with the Delaware Secretary of State is a sufficient jurisdictional act" to "subject [a nonresident defendant] to service of process under Delaware's Long-Arm Statute"); *see generally* 1 Wolfe & Pittenger, *supra*, § 3.04[c][3], at 3-103.

[51] *Ramada Inns, Inc. v. Drinkhall*, 1984 WL 247023, at *2 (Del. Super. May 17, 1984) ("Literally, Delaware law requires both a tortious act within the State and an act or omission within this State."); *see also Ohrstrom v. Harris Tr. Co. of N.Y.*, 1998 WL 8849, at *3 (Del. Ch. Jan. 8, 1998) (holding that personal jurisdiction was lacking under Section 3104(c)(3) over a transfer agent because, even if the defendant injured plaintiffs in Delaware, all relevant acts occurred at the agent's office in New York).

22

thereby causing tortious injury.[52] Decisions from other courts treat omissions as sufficient, for example, when part of a claim for fraud by omission,[53] a tortious failure to warn,[54] or conversion resulting from the failure to determine whether checks were forged.[55]

The Long-Arm Statute does not appear to require that the omission be part of the cause of action. Instead, it requires a causal link between the omission and the tortious injury.[56] The statute states that the claim must "arise from" and not merely

---

[52] *See Aeroglobal Cap. Mgmt., LLC v. Cirrus Indus., Inc.*, 2003 WL 77007, at *4 (Del. Super. Jan. 6, 2003) (explaining that the proper exercise of jurisdiction depends "upon whether the act or omission which allegedly took place in Delaware proximately resulted in some harm to the complaining party."); *Dillon v. Cosner*, 1991 WL 215906, at *2 (Del. Super. Sept. 20, 1991) (explaining that the concept of a tortious act or omission "involves a breach of duty to another.").

[53] *Dillon*, 1991 WL 215906, at *2 (holding that fraudulent concealment and fraudulent misrepresentations constituted tortious injuries under Section 3104(c)(3)).

[54] *Walsh v. Nat'l Setin Co., Inc.*, 411 F. Supp. 564, 570–71 (D. Mass. 1976) (applying Massachusetts long-arm statute to a "failure to warn" omission and holding that any omission "must be considered as having occurred in North Dakota.").

[55] *Jackson v. State St. Bank & Tr. Co.*, 674 N.E.2d 706, 710 (Ohio 1996) (failure to verify checks that were forged and cashed in Ohio, causing loss of insurance proceeds, sufficient to establish tortious injury in Ohio).

[56] *LaNuova*, 513 A.2d at 768 (explaining that the transaction of business only supports jurisdiction "with respect to claims which have a nexus to the designated conduct."); *see Terramar Retail Ctrs., LLC v. Marion #2-Seaport Tr. U/A/D/ June 21, 2002*, 2017 WL 3575712, at *6 (Del. Ch. Aug. 18, 2017) (explaining that the "principal factor" Delaware courts examine "is the extent of the factual relationship between the formation of the Delaware entity and the cause of action").

be "related to" the omission.[57] An omission that is part of the cause of action necessarily satisfies that test. A sufficient nexus can also exist if the Delaware-directed act or omission "set in motion a series of events which form the basis for the cause of action before the court."[58]

Here, the omission of a filing with the Delaware Secretary of State was a collateral effect of the alleged breach of duty. The omitted filing neither forms the basis of the Company's claim nor bears any causal connection to the Company's injury. There is, of course, an omission that does satisfy the causal criteria: Knörle's failure to vote in favor of either the VC Financing or the PE Financing. But that omission did not take place in Delaware.

The Company therefore cannot ground jurisdiction over Thiem on the omission of a filing with the Delaware Secretary of State. That outcome reveals an odd asymmetry. It is easier to assert personal jurisdiction when a plaintiff bases its claims on a transaction that took place rather than one that was prevented from taking place. However strange it might seem to treat equally culpable actors differently

---

[57] *See Lone Pine Res., LP v. Dickey*, 2021 WL 2311954, at *5 (Del. Ch. June 7, 2021) (citing *Microsoft Corp. v. Amphus, Inc.*, 2013 WL 5899003, at *11 (Del. Ch. Oct. 31, 2013)).

[58] *EBG Hldgs. LLC v. Vredezicht's Gravenhage 109 B.V.*, 2008 WL 4057745, at *6 (Del. Ch. Sept. 2, 2008) (citation omitted).

based on action versus conscious non-action, that holds true for the Long-Arm Statute and conspiracy jurisdiction.[59]

### III. CONCLUSION

The complaint fails to pled a reasonably conceivable basis for exercising personal jurisdiction over Thiem. He is dismissed from the case.

---

[59] With the proliferation of investor-level and counterparty-level blocking rights, securing jurisdiction over the parties who exercise those rights may become an obstacle. At present, however, Delaware lacks a statutory method of serving process and establishing personal jurisdiction that can overcome it.